**Henry HALL, Plaintiff,**

v.

**U. S. A., Defendant.**

No. 77 C 1754.

United States District Court,
N. D. Illinois, E. D.

Feb. 9, 1979.

---

7. This court has previously condoned use of video tapes, but infrequently.

Sheldon P. Zisook, Chicago, Ill., for plaintiff.

Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM

LEIGHTON, District Judge.

This suit is by the owner of a single story frame house and garage in Chicago which, without notice to him and without his authority, were ordered demolished by an employee of a federal agency. Invoking the Federal Tort Claims Act, 28 U.S.C. § 2674, the owner seeks to recover damages from the United States in the sum of $15,808 he claims to have paid in rehabilitating the house, a project in process at the time of the unauthorized demolition.

The United States does not question the owner's proprietary interest, nor does it dispute that the house was demolished without authority on orders of a federal employee. It only insists that the owner has not proved the damages he claims; and that in any event he was guilty of negligence which was a contributing cause of the demolition. The case has been heard without a jury; and from the evidence, the court makes findings of fact and reaches conclusions of law.

### I.

For some time prior to the events of this controversy, the plaintiff Henry Hall was in the business of purchasing delapidated buildings in Chicago and rehabilitating them for a profit. On April 18, 1975, for the sum of $9.77 he purchased from the Department of Housing and Urban Development (HUD) a parcel of real estate situated at 5624 South May Street in the city of Chicago that had a single story house with a basement and a garage.[1] He was given a duly executed deed to the property which he recorded. At the time of this purchase, in fact, since July 29, 1974, there was pending in the chancery division of the circuit court of Cook County a suit against the owners of the house for the purpose of enforcing compliance with the building code of the city of Chicago. On June 5, 1975, the city authorities, having learned that Hall was the new owner of the property, had the chancery suit continued to August 7, 1975 in order to implead him. This was done; and on September 25, 1975, Hall appeared in the suit; the case was then continued generally to November 20, 1975, with an entry in the record which stated that "Bldg to be re hab [sic]."

---

1. Although this court has conducted several pretrial conferences with the parties, received from them status reports, and has heard all of the evidence, nothing has surfaced from which it could learn how a Chicago city lot with a house having a basement and a garage came to be worth $9.77.

Hall claims that shortly after acquiring possession of the house, that is on June 2, 1975, he entered into a contract with a Fonzie Walton for work to plaster ". . . six rooms located 5624 South May [sic] . . ." and generally repair the house for the sum of $7,308. Walton acknowledged receipt of $3,500, and that Hall was to pay the ". . . balance due when job is completed." He later acknowledged having received from Hall the sum of $3,880.

Then on August 12, 1975, according to Hall, he entered into a contract with Jarius Hosea for work on the house: replacement of bathtub, face bowl, toilet stool, kitchen sink and similar items, together with repair to the heating equipment, for the sum of $8,500. Hosea acknowledged that he received an initial payment of $4000 from Hall; then $250 on August 28, 1975, $1500 on September 4, 1975, and the balance in full of $2750 on October 7, 1975. Hall's claimed payments on the contracts with Walton and Hosea totalled $15,808,[2] the amount he seeks to recover from the United States.

On September 17, 1975, three city of Chicago building inspectors viewed the house at 5624 South May Street. The report they signed did not contain any reference to rehabilitation work being done on the building. However, earlier that summer Erma Maury, a woman who lived nearby, saw men go in and come out of Hall's house; she saw one man carrying a ladder, although she could not tell what he was doing; she saw men bring into the building paint, toilets, and a bathtub. Mrs. Maury heard hammering, banging, and noise that indicated someone was sawing.

On October 1, 1975, without notice to Hall, the Secretary of the Department of Housing and Urban Development, not then owner of the property in question, acting through the director of HUD's property disposition branch, wrote to the chief code enforcement officer of the Chicago Department of Buildings and directed that the house HUD had sold to Hall be demolished. Based on this authorization, and also without notice to Hall, the chancery suit that had been continued to November 20 was brought before a trial judge who entered a decree of demolition. Sometime early in March 1976, the building was demolished; Hall learned of this fact when he went to his property and on inspection found it graded, leveled and topped. The demolition cost of $1350, at the direction of HUD's acting director of property disposition, was paid by the United States.

## II.

This court has exclusive jurisdiction of civil actions on claims against the United States, recoverable in money damages, for injury to or loss of property caused by the negligent or wrongful act or omission of any federal employee who, acting within the scope of his office or employment, commits a tort under circumstances where the United States, if it were a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurs. *McCall v. United States,* 338 F.2d 589 (9th Cir. 1964); 28 U.S.C. §§ 1346(b), 2674. In Illinois, the demolition of a building without notice to the owner and without his authority is a tort answerable in damages. *Trzos v. Berman Leasing Company,* 86 Ill.App.2d 176, 229 N.E.2d 787 (1967); *City of Chicago v. Leakas,* 6 Ill.App.3d 20, 284 N.E.2d 449 (1972); *Schwartz v. City of Chicago,* 21 Ill.App.3d 84, 315 N.E.2d 215 (1974); *Hecko v. City of Chicago,* 25 Ill.App.3d 572, 323 N.E.2d 595 (1975). Therefore, the government concedes, as it must, that there is a claim against it, one which arises from the fact that a federal employee, without notice or authority, ordered the demolition of a house owned by the plaintiff.

**2.** The government points out, and this court agrees, that Hall paid Walton $72 more than was called for in their contract. This discrepancy, rather than casting doubt on plaintiff's testimony, supports his claim that he kept inaccurate records of his transactions and that he dealt informally with his mechanics.

## A.

■ In support of this claim, Hall testified and offered in evidence two documents he said were his contracts with Walton and Hosea, which he swore contained acknowledgements of payments totalling $15,808 for repair and rehabilitation of his house at 5624 S. May Street in Chicago. The documents, forms of short general contracts, were dated and each had the telephone number of the contractor. Hall said that at the time of the trial in this case he could not locate either Walton or Hosea; but he insisted that he paid them the money he was claiming. He said that during the continuance given him in the chancery suit from September 25 to November 20, 1975, he relied on the statement made to him by the trial judge that he was being given the opportunity to rehabilitate the building. Hall said that the house in question was not the only one he had purchased from HUD and had rehabilitated. He testified, and he was not contradicted, that on one occasion he acquired a building from HUD and rehabilitated it in such a way that federal officials took photographs of his labors which were displayed in other parts of the country as an example of what can be done with buildings taken by HUD in foreclosures. Hall said that with regard to how he paid those who worked for him, it was always in cash; and that he and members of his family worked at the task of rehabilitating buildings he acquired in the way described in his testimony.

The government argues that Hall should not be believed because he could not recall when the rehabilitation work on his house began or was completed; that he had no recollection as to when the building was demolished; and he did not produce the testimony of Walton and Hosea to corroborate him. Further, the government argues that Hall never obtained a building permit nor had prepared any architectural or engineering plans which would show the basis for the value enhancement testimony he gave in support of his claim for $15,808.

There is much to be said for the government's arguments against Hall's testimony.

It is true he did not seem to recall with precision the events surrounding the rehabilitation work he said was done on his house; the contractors with whom he dealt did not appear as witnesses; and it should be borne in mind that Hall was an interested witness, testifying in support of his claim. However, this court observed Hall as he testified. Generally, the carriage, behavior, bearing, manner and appearance of a witness, in short his demeanor, is a part of the evidence. The words a witness uses are by no means all that we rely on in making up our minds about the truth of questions that arise in our ordinary affairs. See *Dyer v. MacDougall,* 201 F.2d 265, 268–269 (2d Cir. 1952).

With this principle in mind, and taking into account the factors to be weighed, it cannot be said that Hall's testimony was inherently improbable; to the contrary, it had a ring of truth. The fact that he did not call his contracting parties to corroborate him, he being an interested witness, is only a consideration which goes to the weight of his testimony. *Travelers' Fire Insurance Co. v. Arnold,* 212 Ark. 1006, 208 S.W.2d 773 (1948); *In re Schaff's Estate,* 274 App.Div. 1020, 85 N.Y.2d 147 (1948); 32A C.J.S. Evidence § 1031(2). It is not clear from the government's showing that the kind of work Hall said he had done in rehabilitating his house required a building permit or architectural plans. Chapter 43, § 43–2, Municipal Code of Chicago, provides that "[a] permit shall not be required for any minor repairs as may be necessary to maintain existing parts of buildings, . . ." The work for which Hall contracted, although extensive, were necessary to maintain existing parts of the house. Hall was vigorously cross-examined; yet, it was not shown that the telephones whose numbers were stated in the contracts did not exist, or that the names of the contracting parties were spurious. In fact, the government was as unsuccessful in finding Walton and Hosea as was Hall. Finally, the testimony of the woman who lived near Hall's building corroborated him. Therefore, this court concludes that there is no reasonable justification for rejecting Hall's testimony. *Iod-*

ice v. Calabrese, 345 F.Supp. 248 (S.D.N.Y. 1972); see Lieberman v. Matson Navigation Company, 300 F.2d 661 (9th Cir. 1962).

### B.

The government also argues that even if Hall's testimony were accepted, he should not recover in this case because his conduct contributed to the demolition about which he complains. This argument is based on Hall's appearance in the chancery suit on September 25, 1975; his knowledge that the case was continued to November 20 when he either appeared or failed to do so; and his failure to move for vacature of the demolition decree that had been entered more than 30 days before, on October 10. The government insists that by these acts, Hall waived his rights under the law. This argument is made despite the fact Hall is a layman and the record is silent concerning the extent to which he knew Illinois civil procedure. And there is no suggestion in this record that anyone called Hall's attention to the fact that more than 30 days had elapsed since entry of the demolition decree.

The applicable Illinois statute governing civil practice provides that "[i]n all cases tried without a jury, any party may, within 30 days after the entry of the decree or judgment, . . . file a motion for a rehearing, or a retrial or modification of the decree or judgment or for other relief." Ill.Rev.Stat.1975, ch. 110, § 68.3(1). By this statute and the cases construing it, a court in Illinois is without authority to grant a motion to vacate filed later than 30 days from a final decree, except in an extraordinary circumstance that would merit post-judgment relief as provided by Section 72 of the civil practice act. Pape v. Department of Revenue, 40 Ill.2d 442, 240 N.E.2d 621 (1968). This court knows that even experienced Illinois lawyers falter in the vagaries of civil procedure that distinguish between the case where a final decree can be vacated within 30 days of entry and one which would qualify for a petition invoking the Illinois statutory form of common law writ of error coram nobis. See Fultz v. Haugan, 49 Ill.2d 131, 273 N.E.2d 403 (1971); Campo v. Clark Theater, 123 Ill. App.2d 145, 260 N.E.2d 29 (1970). Ordinarily, if a person does not know of a right, he cannot be held to have waived it. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Upper Columbia River Towing Co. v. Maryland Casualty Co., 313 F.2d 702, 706 (9 Cir. 1963); Mollihan v. Stephany, 52 Ill.App.3d 1034, 10 Ill.Dec. 870, 875, 368 N.E.2d 465, 470 (1977). Plainly, Hall did not know what he could have done about the demolition decree. Therefore, this court will not hold that his conduct was a waiver of his rights under the law.

### III.

For the foregoing reasons, the court finds the issues in favor of the plaintiff Henry Hall and against the United States; and judgment will be entered in his favor for the sum of $15,808 with costs taxable as provided by law.[3] See Consumers Union of U. S., Inc. v. Board of Governors of Federal Reserve System, 410 F.Supp. 63 (D.D.C. 1976). And pursuant to 28 U.S.C. § 2678, it is ordered that as reasonable attorney fees, counsel for the plaintiff be paid 20 per centum (20%) of the judgment in this case.

So ordered.

---

3. In doing so, the court bears in mind that HUD, without any right or obligation in the matter, paid $1,350 for the demolition of Hall's house. However, to a man like Hall who devotes industry and effort in acquiring title to a house for $9.77, it must be small comfort for him to learn that this powerful federal agency had borne the cost of demolishing his property.