UNITED STATES of America, Plaintiff,

v.

Ronald BLACK, Defendant.

No. 80 CR 295.

United States District Court,
N. D. Illinois, E. D.

April 2, 1981.

Thomas P. Sullivan, U. S. Atty. by Julian Solotorovsky, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

Richard A. Beiley, Bierman, Sonnett, Beiley & Shohat, P. A., Miami, Fla., for defendant.

## OPINION

BUA, District Judge.

The defendant, Ronald Black, has been charged in a one count indictment with violating 21 U.S.C. § 841(a)(1) by knowingly and intentionally possessing, with the intent to distribute, approximately 540 grams of a mixture containing cocaine.

On March 13, 1981 the court held a hearing on defendant's motion to suppress the mixture seized from him at the time of his arrest. The defendant and two Chicago police officers, Rosemary Burzinski and Thomas Kinsella, testified at the hearing. At the conclusion of the hearing, the court denied the defendant's motion. The defendant then waived his right to a jury trial and stipulated to a trial by the court based on the testimony taken at the hearing on the motion. In addition, the defendant stipulated to the admission of a lab report relating to the composition of the mixture seized from him, and to the testimony of a Drug Enforcement Agency chemist, Sanford Angelos, that after analysis the mixture was found to contain cocaine. Over the objection of the defendant, the court admitted Government Exhibit 2 in evidence. Exhibit 2 is the mixture seized from Black and later analyzed by Sanford Angelos.

The following constitutes the court's findings of fact and conclusions of law on the defendant's motion to suppress and the court's findings on the merits. Fed.R. Crim.P., Rules 12(e), 23(c).

The testimony taken at the hearing revealed the following facts. On May 14, 1980, Officers Kinsella and Burzinski were engaged in surveillance of flights arriving from the Miami-Fort Lauderdale area at O'Hare Airport. They were assigned to assist the Drug Enforcement Agency in conducting narcotics investigations at the airport. The officers focus much of their surveillance activity at O'Hare on incoming flights from southern Florida, because the DEA has determined that this area is the main source of cocaine distribution in the United States.

Rosemary Burzinski has been a Chicago police officer for eight years. She has been assigned to narcotics investigations for the last eighteen months. At the time of the defendant's arrest she had been assigned to O'Hare Airport for two months. Thomas Kinsella has been a Chicago police officer for seventeen years and has been engaged in narcotics investigations for the last nine years. He has participated in over a thousand seizures of narcotics. He has been assigned on a full-time basis to O'Hare for one year and prior to March, 1980 he had been assigned to O'Hare on a part-time basis for two years, and had participated in approximately fifty seizures of narcotics and seventy-five investigatory stops of suspected drug couriers at O'Hare. Officer Burzinski had participated in approximately ten seizures and fifty stops at O'Hare prior to the defendant's arrest.

At approximately twelve noon on May 14, 1980, Officers Burzinski and Kinsella were standing in the concourse outside of gate F–2 waiting for passengers to disembark from United Flight 965 from Fort Lauderdale. The first passenger who exited the

plane was Ronald Black. The officers watched him as he came down the boarding ramp, first jogging and then walking at a rapid pace to the waiting area of the gate. He was carrying a black Continental Airlines travel bag and appeared to both officers to be disoriented. As he reached the concourse he stopped and began looking around the concourse area. After several minutes he proceeded down the concourse in the direction of the terminal. Black appeared to Kinsella to be nervous as he exited the plane. Black's nervousness, apparent disorientation, and rapid exit from the plane made Kinsella suspicious. Kinsella decided to follow Black down the concourse. As Black walked, he appeared to Kinsella to be unsure of his footing, looked over his shoulder at least once and stumbled as he looked ahead again.

Black proceeded at a very slow pace to the intersection of the E and F concourses where there was a United Airlines flight information screen. He viewed the screen for about thirty seconds and then spent several minutes observing his surroundings. He looked continually around and behind him in all directions in a manner that suggested to Officer Burzinski that he was not looking for anyone or anything in particular but was surveying the people in the area. The officers kept him under surveillance from a distance of about twenty feet. Officer Kinsella testified that there was nothing unusual about Mr. Black's demeanor at this time.

After several minutes at the flight screen, the officers observed Mr. Black proceed to gate F–3 where he entered the waiting area and sat down without checking in. The check-in counter was manned and passengers were checking in for the next flight scheduled to depart from that gate. The next flight scheduled to leave from gate F–3 was a non-stop flight for Honolulu, scheduled to depart at 1:15 p. m. It was now approximately 12:15 p. m.

Mr. Black sat in the waiting area at gate F–3 for about five minutes. He then picked up his travel bag and walked out of the waiting area to the concourse. As Black entered the concourse, the two officers, who had been standing in the concourse just outside the waiting area, identified themselves to him. Both of the officers were casually dressed in blue jeans. The officers showed Black identification and Kinsella then asked Black in a normal voice if he could speak to him for a second. Black said, "sure". Kinsella asked Black if he had identification and an airline ticket. Black presented a Hawaii driver's license and a first-class one-way ticket to Honolulu. The ticket was in the name of Mr. R. Plack. It cost $587.50 and had been purchased for cash at the Hollywood Travel Agency in Hollywood, Florida.

Kinsella then asked Black why he was traveling under a fictitious name. Black offered no explanation, but merely shrugged his shoulders in response, Kinsella asked Black what he had been doing in Florida. Black told Kinsella that he had been in Florida surfing for the past three months and, after he had run out of money, he had harvested coconuts to earn money for his return ticket to Hawaii. At or about this time Kinsella suggested that they move a few feet away from the area of the initial stop in order to avoid blocking traffic in the concourse. Kinsella also handed Black's license and ticket to Burzinski at or about this time.

By now Black appeared to both officers to be extremely nervous. Kinsella asked Black what was in the travel bag and Black said that it contained books, clothes, and toilet articles. Kinsella asked Black in a normal voice if he would consent to a search of the travel bag. Black responded in the affirmative. After Black consented to the search, Kinsella specifically informed Black that he need not consent to a search of the bag. Without responding further, Black immediately knelt down, unzipped the bag, took out a book and handed it to Kinsella. Kinsella inspected the book, put it on the floor next to the bag and then reached in the bag and took out a shaving kit. Kinsella opened the kit, inspected the articles in it, and then placed it on the floor next to the bag. Black said nothing and made no

attempt to stop Kinsella from inspecting the shaving kit and its contents.

Kinsella then reached into the travel bag again and grasped a shirt. Kinsella felt an object through the shirt. As Kinsella began to withdraw the shirt from the bag, Burzinski, who was standing across from her kneeling partner, could see a clear plastic bag containing white powder wrapped in the folds of the shirt. The plastic bag containing the powder was itself wrapped in a torn paper bag. Because of the way the bag containing the white powder was wrapped in the folds of the shirt it was not visible to Kinsella as he brought the shirt to the top of the open travel bag. Just as Kinsella's hand reached the top of the travel bag, Black grabbed Kinsella's wrist and while pulling Kinsella's hand out of the travel bag, told Kinsella not to search any further. As Black yanked Kinsella's hand out of the travel bag, the bag containing the mixture fell out of the shirt to the bottom of the travel bag. Kinsella saw the plastic bag containing the white powder in plain view on the bottom of the travel bag and told Black he was under arrest.

At no time during this sequence of events did either of the officers display their weapons, raise their voices, or otherwise threaten or coerce Black. The entire incident, from the time the officers identified themselves to Black until the defendant's arrest, lasted no more than a few minutes. The incident took place entirely in a well-lit and spacious public concourse with other travelers present.

Nothing about the circumstances surrounding the officers' contact with the defendant indicates that the defendant was coerced or that he was not free to refuse the officers' request for identification or to refuse to give his consent to a search of the travel bag.

Black appeared to this court to be an articulate, intelligent young man. He is 24 years old and a college graduate. After viewing the defendant on the stand, and seeing the manner in which he testified, this court does not believe that Mr. Black could reasonably have felt coerced in any way by the officers' conduct. I can only conclude that he voluntarily produced his identification and gave his consent to the search of his travel bag. As Kinsella's questions led to the request for Black's consent to a search of the travel bag, Black became visibly shaken, but Black's nervousness does not indicate that the officers' conduct was coercive. Rather, Black's increasing nervousness indicates that he realized that his strategy of cooperation was failing to allay the officers' suspicions. It is not surprising that Kinsella asked Black for permission to search the travel bag after hearing Black's tale of picking coconuts in Florida to earn money to return to Hawaii. I believe it is safe to say that Kinsella probably found Black's response as odd as the court did when Mr. Black lied under oath as the prosecution questioned him regarding his stay in Florida. It is not within the common experience of this fact-finder that a young person who is allegedly forced to pick coconuts to earn money for a return ticket to Hawaii decides to fly first-class.

This court believes that Black made a quick but calculated judgment as to how he could best avoid detection. Not until it was too late, that is, not until Burzinski had already seen the white powder and Kinsella was about to uncover it did Black withdraw his consent to the search. Unfortunately for Black, the manner in which he withdrew his consent caused the cocaine to come into Kinsella's view.

Based on these facts the court concludes that the government has met its burden of showing that the discovery of the cocaine was not the result of an unreasonable search and seizure in violation of the fourth amendment, but rather was the result of both Black's initial voluntary consent, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) and his clumsy attempt to revoke his consent.

The initial question that must be answered in this case is whether the officers' initial request to speak to Mr. Black constituted a seizure of his person. I must conclude that it did not. The officers merely identified themselves in a conversational

tone of voice as Black was walking past them and asked if they could speak to him. I conclude, in light of all the circumstances surrounding the initial contact, that no reasonable person would have believed that he was not free to disregard this request and walk away. *United States v. Mendenhall,* 446 U.S. 544, 552–54, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980). *See also Terry v. Ohio,* 392 U.S. 1 at 32–33, 88 S.Ct. 1868, at 1885–1886, 20 L.Ed.2d 889 (1968) (Harlan, J., concurring); *id.* at 34 (White, J., concurring).

> "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way *restrained* the liberty of a citizen may we conclude that a 'seizure' has occurred." (emphasis added).

*Terry v. Ohio,* 392 U.S. at 19, n.16, 88 S.Ct. at 1878 (1968).[1]

When Kinsella asked if he could see Black's identification and airline ticket, Black freely and voluntarily produced a driver's license and ticket. Kinsella saw the different names on these items, the substantial cash price of the first-class ticket, and the heightened nervousness of the defendant. He then heard Black say that he had picked coconuts in Florida to earn the cash for the flight. There is absolutely no doubt that these facts justified the officers' request for permission to search Black's travel bag. Thus, in light of all of the circumstances, even if Burzinski's fail-

ure to immediately and independently return Black's ticket and driver's license turned what had been, up to this time, mere "personal intercourse" into an investigatory stop or detention, this stop was justified by what was now the clearly reasonable suspicion of the officers and was not tainted by any prior unlawful seizure of Black.

Moreover, this court finds from all the circumstances surrounding Kinsella's request to search the travel bag, that the government has met its burden of proving that Black voluntarily consented to that request. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Sanchez-Jaramillo,* 637 F.2d 1094 (7th Cir. 1980).

By the time that Black revoked his consent to the search of his travel bag, Officer Kinsella was in the process of withdrawing the shirt in which the cocaine was wrapped from the travel bag. Officer Burzinski could see the bag containing the white powder wrapped in the shirt and Black's clumsy and mistimed attempt to pull Kinsella's hand out of the bag was itself the cause of the cocaine coming into Kinsella's view.

Given this court's decision that the defendant's motion to suppress should be denied and that the mixture seized is properly admissible in evidence, it only remains for this court to determine the question of the defendant's guilt or innocence of the charge made in the indictment. Fed.R.Crim.P., Rule 23(c).

---

1. Moreover, even if this court is wrong, as a matter of law, in its conclusion that there was no seizure of Black at this time, and that simply by virtue of the officers' request to speak to him, Black was subjected to a brief investigatory detention that implicated his rights under the fourth amendment, *cf. Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), the court concludes that the officers were justified in this request by their reasonable suspicion that "criminal activity may be afoot." *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also United States v. Cortez,* —— U.S. ——, 101 S.Ct. 690, 66 L.Ed.2d 621. This court's assessment of the officers' actions must take into account the whole picture as seen by the officers and recognize that "a trained officer draws inferences and makes deductions ... that might well elude an untrained person." *Id.* at ——, 101 S.Ct. at 695. Kinsella did articulate his reasons for suspecting Black of criminal activity. These reasons included Black's speedy exit from the plane in an apparently disoriented state, his nervousness as he scanned the concourse, the fact that he looked over his shoulder on his way to the flight information screen and the fact that he entered the waiting area of gate F–3 without checking in. This court believes that the officers did have an objective basis for suspecting Black in light of the officers' experience, observation of Black, and their knowledge that the Miami-Fort Lauderdale area was the principal source of cocaine distribution in the United States.

The court finds beyond a reasonable doubt that on March 14, 1980, defendant knowingly and intentionally had in his possession at O'Hare International Airport in Chicago, Illinois approximately 540 grams of a mixture containing cocaine of from 72 to 79 percent purity. Furthermore, the court finds that the defendant knowingly and intentionally possessed this cocaine with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). *United States v. Edwards,* 602 F.2d 458 (1st Cir. 1979); *United States v. Hill,* 589 F.2d 1344 (8th Cir. 1979); *United States v. Muckenthaler,* 584 F.2d 240 (8th Cir. 1978); *United States v. Nocar,* 497 F.2d 719 (7th Cir. 1974), *cert. denied,* 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 315.