UNITED STATES of America, Plaintiff,

v.

Richard J. RIGALI, Defendant.

No. 80 CR 752.

United States District Court,
N. D. Illinois, E. D.

May 18, 1981.

---

Raymond J. Smith, Burke & Smith, Chtd., Chicago, Ill., for plaintiff.

Robert Hackman, Asst. U. S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

### ASPEN, District Judge:

Defendant Richard J. Rigali has been charged with knowingly and intentionally possessing, with the intent to distribute, approximately 128 grams of a mixture containing cocaine in violation of 21 U.S.C. § 841(a)(1).

On February 25, 1981, the Court held a hearing on defendant's motion to suppress, pursuant to Rule 12(e) of the Federal Rules of Criminal Procedure, both the evidence obtained during the search and a statement made by Rigali subsequent to his arrest. Rigali and officers Thomas Kinsella and Ricardo Abreu of the Chicago Police Department testified at the hearing. Based upon the findings of fact and conclusions of law that follow, the motion is denied.

At approximately 8:00 p. m. on December 19, 1980, Officers Kinsella and Abreu were on duty assigned to the DEA Task Force at O'Hare Airport monitoring the arrival of a Delta Airlines flight from Fort Lauderdale, Florida. Fort Lauderdale was known to the officers to be a source-city for drug traffic. Officers Kinsella and Abreu noticed that Rigali, the second person to emerge from the plane, carried only a small suitcase, walked directly to the end of the gate and began looking around and back in the direction from where he came. He was not, however, looking at the directional signs or the television monitor. They also noticed that, although he had just arrived from Florida, he did not have a suntan. Rigali made deliberate eye contact with another passenger who had departed from the plane and proceeded down the concourse in the direction of the terminal building. While walking down the concourse, he continued to look over his shoulder. No other passengers within the officers' field of vision acted in the same manner.

Upon reaching the vicinity of Gate 46, the passenger with whom Rigali had made eye contact and who had been following behind him, met Rigali and briefly spoke with him. As Rigali and the other passenger walked to the terminal, Rigali continued to look over his shoulder and to the side, again unlike other passengers walking in the same area of the concourse.

As they reached the terminal building, Rigali and his companion turned right and went past the concession area. They then stopped near the entrance of a men's bathroom in a deserted, unenclosed alcove. The men were not heading toward the baggage area and appeared not to be going toward any parking lot or passenger arrival or loading area. At this point, Abreu and Kinsella walked up to Rigali and the other passenger. Kinsella[1] approached Rigali and Abreu approached the other passenger.

Kinsella approached Rigali, showed him his police star and identification card and identified himself as a police officer. Kinsella then said, "Can we ask you a few questions?"[2] Rigali said, "Sure." When

---

[1] Officer Kinsella is an experienced police officer. He has been investigating narcotics for nine years and has been a member of the DEA Task Force for three years. On the average, he monitors 7,000 passengers per week arriving at O'Hare Airport and of this number, he approaches approximately five persons per week for questioning. As the Supreme Court recently noted in the context of a border search, a law enforcement officer views the totality of the circumstances in any given situation and "draws inferences and makes deductions—inferences and deductions that might well elude an untrained person." *United States v. Cortez,* —— U.S. ——, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

[2] At the evidentiary hearing, Officer Kinsella testified as follows:

Kinsella asked to see Rigali's identification and airline ticket, Rigali produced a badge case with an indentation where a Chicago Police star normally would be found. The badge case contained an Illinois driver's license, but did not contain a Chicago Police star or Chicago Police identification.

Rigali then stated that he was a Chicago Police Officer. Kinsella asked where Rigali worked and Rigali responded that he was on "medical roll," meaning that he had called in sick. Kinsella remarked that when an officer goes on medical roll they do not take away his star and identification. Rigali then said that he was not on medical roll, but rather, was on medical disability. Rigali removed from his badge case, a frayed, dirty, torn letter from the police department surgeon stating that Rigali had a heart condition and that he was only fit for light duty status. Kinsella again asked Rigali where he worked, since the letter indicated that Rigali was not on disability, but rather, was fit for light duty status. Rigali then stated that he had resigned from the police department several years ago.[3]

Kinsella then asked Rigali for his airline ticket and Rigali stated that he had left it aboard the plane. Kinsella inquired as to Rigali's trip to Florida and Rigali responded that he had "been down" the previous day to visit friends. Kinsella next stated that he believed Rigali was carrying narcotics. Rigali did not respond. Kinsella asked Rigali if he would consent to a search of his person and his suitcase and advised Rigali that he did not have to give his consent. Rigali then consented to a search of his suitcase and his person.[4]

Kinsella searched Rigali's suitcase and found a one-way airline ticket from Fort Lauderdale in the name of John Flynn. When asked about the ticket, Rigali first stated that he found it on the plane, but then admitted that it was the ticket that he had used to fly from Fort Lauderdale.

Kinsella next conducted a pat-down search of Rigali. When the search reached Rigali's boots, Kinsella felt a large bulge. Rigali then took a step or two backwards and asked if they had to do the search there. Kinsella told Rigali that there was nobody around and that they did have to do the search there. Rigali leaned down, took off his boot, turned it over, and poured out a packet containing a quantity of white powder. Rigali then removed his other boot and poured another similar packet. Rigali then was placed under arrest. After Rigali was arrested and advised of his constitutional rights, which he waived in writing, he stated that he was carrying narcotics for an individual named Maurice Williams and that he was being paid $500 plus expenses to transport the narcotics.

Rigali contends that he was illegally "seized" within the meaning of the fourth amendment when Officer Kinsella approached him, identified himself as a police officer, and asked whether he could ask Rigali a few questions. This Court holds that the asking of this simple question un-

---

Q. What did you then do?
A. At that time, they were standing there looking at us and we were walking towards them; and I walked up to Mr. Rigali, showed him my star and I.D. card and identified myself as a police officer and asked him if we could ask him a few questions.
Q. Now did you call out to him, to the best of your memory, before you actually showed him the star?
A. No.
Q. You said, "Can we ask you a few questions?" Is that the idea?
A. That is correct.

3. It is undisputed that Rigali is a former Chicago Police Officer who resigned from the force.

4. Officer Kinsella testified as follows:

Q. What did you say?
A. I asked if he would give his consent to search your person and your suitcase.
Q. Did you use those exact words?
A. I said will he give his consent to search your person and your suitcase.
Q. What did he say?
A. After I said that, I advised him that he had the right not to give consent; and he said that we could search it.
Q. What did he say to that, when you said, "Will you give us consent to search your person," you say, "and your suitcase?"
A. That is correct.
Q. What did he say?
A. He said, "Yes."

accompanied by any show of force or authority or any detention whatsoever does not constitute a "seizure" implicating the protections of the fourth amendment. After Kinsella asked this initial question, all further questions were asked pursuant to Rigali's voluntary consent to be asked a few questions. The Court further finds that the search of Rigali's suitcase and person were conducted pursuant to his voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

In *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 1879 n.16, 20 L.Ed.2d 889 (1968), the Supreme Court stated that,

> Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

Since that seminal opinion, courts have struggled with the issue of what personal intercourse between citizens and police officers constitutes a "seizure," an issue which frequently involves subtle shadings touching upon the individual's understanding of his rights, as well as his desire to avoid the wrath and further suspicion of the officer. *See, e. g., United States v. Pulvano*, 629 F.2d 1151, 1155 n.1 (5th Cir. 1980); *United States v. Robinson*, 625 F.2d 1211 (5th Cir. 1980). In the most recent Supreme Court decision to address this issue, *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), Justice Stewart, joined by Justice Rehnquist, proposed an objective standard by which to evaluate whether a "seizure" has occurred during a police-citizen contact.[5] In their view,

> a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.[6]

446 U.S. at 554, 100 S.Ct. at 1877. (Footnote omitted). *Accord, United States v. Herbst*, 641 F.2d 1161 (5th Cir. 1981); *United States v. Pena-Cantu*, 639 F.2d 1228 (5th Cir. Unit A 1981); *United States v. Black*, 510 F.Supp. 989 (N.D.Ill.1981); *United States v. Jodoin*, Slip Op., No. 80 273–S (D.Mass.1981).

Viewing the circumstances involved in this case, the Court can imagine few police-citizen contacts less inhibiting than the instant one. The officers displayed no weapons and made no threats. There is no indication that the officers did anything coercive or intimidating. Indeed, the officers did not even stop or detain Rigali, since he had stopped prior to being approached. The sole act claimed to constitute a seizure here is the question posed by Kinsella to Rigali: "Can we ask you a few questions?" Under these circumstances, the Court holds that no reasonable person would believe that he was not free to leave. Indeed, if the presentation of this question were held to constitute a "seizure" for fourth amendment purposes, then nearly every police-citizen interaction would be deemed a "seizure."[7] Moreover, if a subjective standard were used, there would be

---

**5.** The Court is not unmindful of the Supreme Court decision in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), where the Court analyzed the factors to be considered in deciding whether a seizure is supported by a reasonable suspicion of criminal activity. However, because this Court finds no seizure to have taken place here, we need not reach the question of whether Kinsella had a reasonable suspicion of criminal activity.

**6.** In a concurring opinion, Justice Powell, joined by Chief Justice Burger and Justice Blackmun, expressly stated that although in their view the seizure question need not be addressed, this did not necessarily indicate disagreement with Justice Stewart's opinion on that issue. 446 U.S. at 547 n.1, 100 S.Ct. at 1873 n.1.

**7.** As stated by Justice Stewart in *Mendenhall*, "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interferences by enforcement officials with the privacy and personal security of individuals." (Citation omitted). 446 U.S. at 553, 100 S.Ct. at 1877.

even greater reason to believe that Rigali knew that at the time of the instant contact he was free to walk away. Rigali was not an uneducated or naive person, confused as to his rights. As an ex-Chicago Police Officer, Rigali was well aware that he was free to refuse to answer Kinsella's question and to walk away.[8]

█ Rigali also asserts that he never consented to the search of his suitcase or person. The only support for this claim is his own testimony, contradicted by the police officers. After listening to Rigali's testimony at the suppression hearing, it is the opinion of the Court that this contradiction must be resolved in favor of the more credible testimony of the officers. Accordingly, the Court finds that the government has met its burden of proving that Rigali voluntarily consented to the search of his suitcase and his person. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Sanchez*, 637 F.2d 1094 (7th Cir. 1980).

For the foregoing reasons, defendant's motion to suppress is denied. This cause is set down for a hearing at the status call of this Court on May 22, 1981, at 11:00 a. m.

---

8. If Rigali had refused to answer the officer's question and walked away, he would not have been in jeopardy. If the officers had arrested Rigali for refusing to answer the question, the arrest would be unconstitutional. *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). But rather than disregarding Kinsella's question, Rigali chose to make an attempt to bluff his way out of trouble. It is clear that Rigali voluntarily acceded to the officer's question in a spirit of apparent cooperation in the apparent belief that his police background would provide him with a means of escaping detection. *See United States v. Mendenhall*, 446 U.S. at 553, 100 S.Ct. 1876–77. *Sibron v. New York*, 392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968). However, the incredible and inconsistent statements made by Rigali from that point on, merely caused the suspicions of the officers to grow.