**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ronald G. BLACK, Defendant-Appellant.**

**No. 81–1883.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 13, 1981.

Decided April 6, 1982.

**130**

Roy E. Black, Miami, Fla., for defendant-appellant.

Julian Solotorovsky, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Senior Circuit Judge, PELL, Circuit Judge, and GRANT, Senior District Judge.*

PELL, Circuit Judge.

The defendant-appellant Ronald Black was charged with possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). The defendant moved to suppress the introduction of the cocaine as evidence against him on the ground that it had been obtained from him through an unlawful search and seizure by Chicago Police Department Officers. The district court denied the motion, and the defendant was convicted following a trial on stipulated testimony. The defendant appeals on the ground that the trial court erred in not granting his motion to suppress. The defendant contends first, that he was seized within the meaning of the Fourth Amendment; second, that the seizure was unreasonable; and third, that he withdrew his consent to a search of his luggage before cocaine was discovered by the arresting officers.

I.

The testimony of the defendant and the two police officers at the hearing on the motion to suppress established how the po-

---

* Robert A. Grant, Senior District Judge of the Northern District of Indiana, is sitting by desig- nation.

lice had obtained the evidence. Although the thorough opinion of the district court, set out at 510 F.Supp. 989 (N.D.Ill.1981), lays out the facts in detail, we repeat them here at some length because the resolution of cases of this type is heavily dependent on their particular facts. On May 14, 1980, Chicago Police Officers Burzinski and Kinsella were engaged in surveillance of flights arriving at Chicago's O'Hare Airport from the Miami-Fort Lauderdale area. The officers had been assigned to assist the Drug Enforcement Agency (DEA) in conducting narcotics investigations at the airport. Because the DEA has determined that the southern Florida area is the main source of cocaine distribution in the United States, police officers were trying to monitor as many flights as possible arriving from that area.

Burzinski, a Chicago Police Officer for eight years, had been assigned to narcotics investigations for eighteen months at the time of the trial, and had been on the O'Hare detail for two months at the time of the defendant's arrest. Prior to Black's arrest, she had participated in approximately fifty stops and ten seizures of narcotics at the airport. Kinsella, a Chicago Police Officer for seventeen years, had been engaged in narcotics investigations for nine years at the time of the trial, and had been assigned to O'Hare for one year full-time, and two years part-time, prior to the defendant's arrest. Kinsella has participated in over a thousand seizures of narcotics, including approximately fifty seizures of narcotics at O'Hare, and seventy-five investigatory stops there of suspected drug couriers.

At around noon on May 14, the officers were monitoring United Airlines Flight 965 from Fort Lauderdale. The first passenger to disembark was the defendant. The officers observed his leaving the jetway alone, walking rapidly or jogging to the waiting area of the gate. The defendant, who was carrying a black Continental Airlines travel bag, appeared to both officers to be disoriented. As he reached the concourse, he stopped to look around, and after several minutes proceeded down the concourse in the direction of the terminal. Kinsella determined, based on the defendant's apparent nervousness, disorientation, and rapid exit from the plane, that it would be appropriate to follow the defendant.

Black walked slowly down the concourse. He appeared to be unsure of his footing, and stumbled at least once. The officers followed Black to the intersection of the F and E concourses where Black viewed a United information television monitor screen for thirty seconds or so. Black then surveyed the area, looking continually around and behind him for several minutes, in a manner that suggested to Burzinski that he was not looking for anyone or anything in particular, but rather was surveying the people in the area. Black then proceeded, with the officers still following, to Gate F–3. It was then about 12:15 p. m. The next scheduled flight was a 1:15 p. m. non-stop flight to Honolulu. The check-in counter was open, and passengers were checking in for the Honolulu flight. The defendant entered the waiting area without checking in, and sat down. The officers noted that Black continued to scan the waiting area and concourse while seated.

After remaining seated for some five minutes, the defendant picked up his bag and walked into the concourse. As he reentered the concourse, the two officers, who had been standing in the concourse just outside the waiting area, approached him. Neither officer was in uniform. They identified themselves as Chicago Police Officers by showing their badges and I.D. cards, and Kinsella asked Black in "an average everyday" tone of voice if he could talk to him for a moment. The defendant responded, "Sure."

Kinsella then asked Black if he had identification and an airline ticket. Black, who now appeared very nervous and visibly shaken, presented a Hawaii driver's license and a first-class one-way ticket to Honolulu. The ticket was in the name of R. Plack, and had been purchased for cash at a travel agency in Hollywood, Florida. Kinsella asked Black why he was traveling under a

fictitious name. Black offered no explanation, but merely shrugged his shoulders in response. Kinsella then asked what Black had been doing in Florida. Black responded that he had gone to Florida three months earlier to go surfing, had run out of money, and had worked picking coconuts to earn money for his return ticket to Hawaii.

At about this point, Kinsella suggested the group step to the side of the concourse to avoid blocking traffic, and the three of them moved a few feet away from the area of the initial encounter. Kinsella then asked Black what was in the travel bag. Black said it contained books, clothes, and toilet articles. Kinsella asked if Black would consent to a search of the bag. Black said yes. Kinsella informed Black that he need not consent to the search of the bag. Without responding further, Black immediately knelt down, unzipped the bag, took out a book and handed it to Kinsella. At about this time Kinsella handed Black's license and ticket to Burzinski. Kinsella inspected the book, placed it on the floor next to the bag, and took out a shaving kit. He opened the kit, inspected its contents, and placed it on the floor next to the bag.

Kinsella then reached again into the bag, and grasped a shirt. As he did so, he could feel a harder object through the shirt. As he began to withdraw the shirt, Burzinski, who was standing across from Kinsella as he knelt beside the bag, could see a clear plastic bag containing a white powder inside a torn paper bag, wrapped in the shirt. As Kinsella's hand, holding the shirt, reached the top of the travel bag, Black grabbed Kinsella's wrist, and while pulling Kinsella's hand out of the bag, told Kinsella not to search any further. As Black pulled Kinsella's hand free of the travel bag, the plastic bag fell out of the shirt to the bottom of the travel bag. Kinsella saw the plastic bag containing white powder in plain view at the bottom of the travel bag. At that point, Kinsella placed Black under arrest.

At no time during the entire incident, which lasted no more than a few minutes, did the officers display their weapons or raise their voices. The entire incident took place in a well-lit and spacious public concourse with other travelers present.

Based on the above evidence, the trial court denied the motion to suppress. The court first determined that the officers' initial request to speak to Black did not constitute a seizure under the standard of *United States v. Mendenhall*, 446 U.S. 544, 552–54, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980), and *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The court noted that the officers merely identified themselves in a conversational tone as Black walked past, and asked if they could speak with him. The court concluded, in light of all the circumstances surrounding the initial contact, that no reasonable person would have believed that he was not free to disregard the request, and walk away. The court further ruled that even if Burzinski's failure to return the defendant's ticket and license turned the incident into an investigatory stop, the stop was justified by reasonable suspicion based on the facts gleaned in the officers' initial interview with Black.

Finally, the court concluded that Black consented to the search of his bag; that by the time Black sought to revoke that consent Burzinski had already seen the cocaine; and that Black's attempt to remove Kinsella's hand from the bag caused the cocaine to come into Kinsella's view as well.

## II.

The primary issue raised on appeal is whether the defendant was unlawfully seized before the search of his travel bag. Analysis of this issue further breaks down into two questions: was the defendant seized, and if so at what point; and, if the defendant was seized, was there objective justification sufficient to create reasonable suspicion that the defendant was engaging in criminal activity.

### A. Did a Seizure Occur, and, If So, When?

The issue of when a seizure has occurred is a somewhat unsettled one. As a

preliminary matter, we note that the case law has developed three tiers or categories of police-citizen encounters. The first, an arrest, is characterized by highly intrusive or lengthy search or detention; the Fourth Amendment requires that such an arrest be justified by probable cause to believe that a person has committed or is committing a crime. *See, e.g., Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The second category, the investigatory stop, is limited to brief, non-intrusive detention during a frisk for weapons or preliminary questioning; this type of encounter is also considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. *United States v. Brignoni-Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The third category of police-citizen encounter is that in which no restraint of the liberty of the citizen is implicated, but the voluntary cooperation of the citizen is elicited through non-coercive questioning; this type of contact does not rise to the level of a seizure. *United States v. Mendenhall,* 446 U.S. 544, 553–55, 100 S.Ct. 1870, 1876–78, 64 L.Ed.2d 497 (1980) (Stewart, J.) (with Rehnquist, J., concurring); *Terry,* 392 U.S. at 19, n.16, 88 S.Ct. at 1879, n.16.

The proper test for determining whether a given police-citizen contact rises to the level of a Fourth Amendment seizure was the focus of inquiry in the recent case of *United States v. Mendenhall, supra.* In *Mendenhall,* two federal DEA agents observed the defendant arrive at the Detroit Airport from Los Angeles, and determined that her conduct was characteristic of drug couriers. After following Mendenhall briefly, the agents identified themselves and asked to see her identification and ticket. On observing that the names on the two items were not the same, the agents questioned Mendenhall on the discrepancy and on her stay in California. The agents returned her ticket and license, and asked her to accompany them to the DEA's airport office. The defendant did so, and consented to a search of her person in the office. Heroin was found, and Mendenhall was arrested.

A majority of the Court concluded that no constitutional violation had occurred. The Court could not, however, reach consensus on the rationale. Justice Stewart, in an opinion joined only by Justice Rehnquist, concluded

that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

446 U.S. at 554, 100 S.Ct. at 1877. Justice Stewart determined that under the facts before the Court, no seizure of the defendant had occurred:

The events took place in the public concourse. The agents wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see the respondent's identification and ticket. Such conduct, without more, did not amount to an intrusion upon any constitutionally protected interest. The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the question was a law enforcement official. See *Terry v. Ohio,* 392 U.S. at 31, 32–33 [88 S.Ct. at 1885, 1886] (Harlan, J., concurring). See also ALI, Model Code of Pre-Arraignment Procedure § 110.1(1) and commentary, at 257–61 (1975). In short, nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the con-

course and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure. 446 U.S. at 555, 100 S.Ct. at 1877.

Justice Powell, joined by the Chief Justice and Justice Blackmun, concurred in the judgment, but declined to join in that portion of Justice Stewart's opinion which found that no seizure had occurred. While specifically noting that he did not necessarily disagree with that conclusion, 446 U.S. at 560 n.1, 100 S.Ct. at 1880 n.1, Justice Powell declined to reach the issue of whether a seizure had occurred on the ground that that question had not been decided below, but ruled that any seizure was justified by the requisite suspicion.

■ Several circuits have adopted Justice Stewart's "reasonable person" test for determining whether seizures have occurred in airport surveillance cases such as the one before us now. *See, e.g., United States v. Viegas*, 639 F.2d 42, 44 (1st Cir. 1981), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348; *United States v. Allen*, 644 F.2d 749 (9th Cir. 1980); *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980); *see United States v. Jefferson*, 650 F.2d 854 (6th Cir. 1981). We are similarly persuaded that this is the appropriate standard under which the seizure question should be resolved. As long as a person remains at liberty to disregard a police officer's request for information, no constitutional interest is implicated. Imposition of an objective standard requiring the presence of circumstances which indicate that that freedom to disregard has been obumbrated properly provides a reliable basis on which the court may determine whether valuable liberty interests have been infringed, without hamstringing the ability of the police to engage in some modicum of legitimate contact with the citizenry.

■ Before determining whether the encounter between Black and the officers rose to the level of a seizure under this test, we point out that the question is a highly factual one, heavily dependent on the circumstances of each case. *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. Our standard of review is accordingly limited to inquiry into whether the decision of the district court is clearly erroneous, and requires that particular deference be given to the district judge who had the opportunity to observe the testimony and demeanor of both the officers and the defendant. *United States v. Patino*, 649 F.2d 724, 728 (9th Cir. 1981) (affirming trial court's finding that a seizure had occurred).

In determining whether a given police-citizen encounter constitutes a seizure in the context of airport surveillance, courts have looked at a variety of factors. The inquiry has focused on three major areas: (1) the conduct of the police; (2) the person of the individual citizen; and (3) the physical surroundings of the encounter. In examining the conduct of the police officer, courts have sought to determine whether "the officer, by means of physical force or show of·authority, has in some way restrained the liberty of a citizen such that he is not free to walk away." *United States v. Viegas*, 639 F.2d 42, 45 (1st Cir. 1981), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (quoting *Terry*, 392 U.S. at 19 n.16, 88 S.Ct. at 1879 n.16). The district court here found that no physical force was used to detain the defendant. Although the defendant contended at the suppression hearing that he had in fact been "surrounded" by the two officers, and prevented from leaving, the trial court rejected that testimony, and found that nothing about the encounter was coercive, and specifically noted, after reviewing the defendant and the manner in which he testified, that the court did not believe that the defendant could reasonably have felt coerced.

■ An individual need not be held at gunpoint or in bonds, however, before a restraint will be found: "any restraint of movement will do." *United States v. Elmore*, 595 F.2d 1036, 1041 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980). Thus, if officers have intimidated an individual through the use

of a show of authority sufficient to make it apparent that the individual is not free to ignore the officer and proceed on his way, a seizure will be found. The determination of precisely when an officer's polite request for an interview rises to the level of a show of authority sufficient to constitute an investigative stop is "not always an easy one," *Viegas*, 639 F.2d at 44, may be "extremely close," *Mendenhall*, 446 U.S. at 560 n.1, 100 S.Ct. at 1880 n.1 (Powell, J., concurring), and calls for a "refined judgment" by the trial court, *Elmore*, 595 F.2d at 1041–42 (quoting *United States v. Wylie*, 569 F.2d 62, 68 (D.C.Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978)). We are not persuaded that the findings of the district judge on this close question of fact are clearly erroneous. He noted that the officers were casually dressed, did not display any weapons, did not raise their voices above a conversational level, and did not threaten Black. We find no error with the district court's findings vis-a-vis the conduct of the officers and agree with its finding that Black's freedom was not restrained by an overbearing show of authority.

Courts have also looked to the characteristics of the defendant in seeking to determine whether even a facially innocuous encounter might, in the circumstances, have overborne the citizen's freedom to walk away. For example, in *United States v. Patino*, 649 F.2d 724 (9th Cir. 1981), the court affirmed a trial court's finding that an individual had been restrained by a request for an interview when she had problems understanding the English language, and was an alien who might therefore have felt a greater compulsion to comply with the request of the police. In contrast to *Patino*, the trial court here found the defendant, "an articulate, intelligent young man," and noted that he was a college graduate. We concur that the defendant was not so naive or vulnerable to coercion that special protection from police contacts was required by the Fourth Amendment.

The final element courts have examined in determining whether a police-citizen encounter was voluntary or coerced is the physical setting in which the encounter took place. For example, in *United States v. Lara*, 638 F.2d 892, 894, 899 (5th Cir. 1981), the court noted that the encounter took place in an area of the airport which was characterized as relatively private, and pointed out that the defendant might have felt isolated from others. Similarly, in *United States v. Jefferson*, 650 F.2d 854, 858 (6th Cir. 1981), the court found a seizure had occurred when the citizen was immediately hustled from the public concourse to a private office, where he was interrogated. In the instant case, the district court found that "[t]he incident took place entirely in a well-lit and spacious public concourse with other travelers present." 510 F.Supp. at 992. This is patently inconsistent with the contention that Black's liberty was restrained by a sort of quasi-imprisonment. Nor are we persuaded that the officers seized the defendant when they suggested moving to the side of the corridor to avoid the flow of traffic. This request, readily acquiesced to by the defendant, did not result in his isolation or restraint, and was therefore of no legal significance. *See United States v. Allen*, 644 F.2d 749, 751 n.3 (9th Cir. 1980).

We conclude, therefore, that the trial court correctly ruled that the officers' initial contact with Black, up to and including the point where Kinsella suggested they move to the side of the concourse, was lawful, and did not constitute a seizure triggering the protections of the Fourth Amendment. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), relied upon by the defendant to establish that probable cause was required for the initial contact is inapposite here. Dunaway was picked up in a police car, brought to police headquarters, given his *Miranda* warnings, and questioned in the station's interrogation room. This highly intrusive and lengthy detention falls into the first tier of Fourth Amendment analysis, and is clearly distinguishable from the facts of the instant case.

The defendant also contends that even if the initial encounter was valid,

Black was seized for Fourth Amendment purposes when the officers took and kept his driver's license and airline ticket. Under our reasoning above, we believe it is clear that the mere request for and voluntary production of such documents does not constitute a seizure, but rather falls into the category of a non-coercive police-citizen encounter. As several courts have realized, however, the retaining of the documents beyond the interval required for the appropriate brief scrutiny, may constitute a "watershed point" in the seizure question. *United States v. Viegas*, 639 F.2d 42, 44 n.3 (1st Cir. 1981), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348; *United States v. Elmore*, 595 F.2d 1036, 1042 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980); *see Mendenhall*, 446 U.S. at 570 n.3, 100 S.Ct. at 1885 n.3 (White, J., dissenting). The question whether a reasonable person would have felt free to leave when Kinsella handed his ticket and driver's license to another officer while kneeling to look into the travel bag is extremely close. In *Elmore*, where a seizure was found, the agents did not merely hold on to the ticket; they actually carried it to the airline ticket counter, away from the physical presence and sight of the defendant. Here the ticket remained in plain view at all times. There is no intimation in the record that Kinsella handed the ticket to Burzinski in a manner that implied he was removing it from Black's grasp or otherwise prohibiting access to it. Rather the fair inference from the testimony is that Kinsella did so simply to free his hands for searching the travel bag, pursuant to Black's consent.

The trial court resolved the question whether the retention of the ticket constituted a search by finding that

in light of all the circumstances, even if Burzinski's failure to immediately and independently return Black's ticket and driver's license turned what had been, up to this time, mere "personal intercourse" into an investigatory stop or detention, this stop was justified by what was now the clearly reasonable suspicion of the officers . . . .

510 F.Supp. at 993. If such reasonable suspicion was present, there would be no Fourth Amendment problem with retention of the documents even if that rises to the level of a seizure. *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980); *Mendenhall*, 446 U.S. at 560, 100 S.Ct. at 1880 (Powell, J., concurring); *Viegas*, 639 F.2d at 44. We therefore turn our attention to the question whether the officers had sufficient articulable facts to give rise to a reasonable suspicion that Black had committed or was committing a crime at the time Kinsella handed the documents to Burzinski.

B. Was There Reasonable Suspicion Sufficient to Warrant Retention of the Defendant's Driver's License and Airline Ticket?

In *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), the Supreme Court examined the circumstances surrounding a *"Terry"* stop of a suspected drug courier by DEA agents in the Atlanta airport, in order to determine whether they gave rise to a reasonable suspicion of criminal activity sufficient to justify the stop. The trial court had ruled that the defendant had been seized without the necessary "articulable suspicion." The appellate court reversed, concluding that because the defendant appeared to the agents to fit a "drug courier profile," there was reasonable suspicion. The drug courier characteristics listed by the appellate court were

(1) the petitioner had arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning, when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together, and (4) they apparently had no luggage other than their shoulder bags.

448 U.S. at 441, 100 S.Ct. at 2753. The Supreme Court rejected these grounds as a sufficient basis for reasonable suspicion, and pointed out that

only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct. The other circumstances describe a very large category of presumably innocent travelers who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.

*Id.*

Kinsella and Burzinski articulated the following grounds for their decision to make the initial contact with Black:

(1) Black had arrived on a flight from Fort Lauderdale;

(2) Black was the first passenger off the plane;

(3) He exited the plane in a speedy fashion and was in a disoriented state;

(4) He appeared to be nervous as he walked through the concourse and viewed the flight information screen.[1]

Despite the Supreme Court's recognition that "a trained officer draws inferences and makes deductions ... that might well elude an untrained person," *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *see Mendenhall*, 446 U.S. at 563, 100 S.Ct. at 1882 (Powell, J., concurring) (quoting *Brown v. Texas*, 443 U.S. 47, 52 n.2, 99 S.Ct. 2637, 2641 n.2, 61 L.Ed.2d 357 (1979)), it is clear that under the *Reid* standard, these factors alone would not justify a *Terry* stop.

In the instant case, however, the officers had several additional facts to consider at the earliest point at which a seizure could be said to have occurred, i.e., when Kinsella passed the documents on to Burzinski. There was the unexplained discrepancy between the names on the ticket and the driver's license; the substantial cash price of the first-class ticket, and the defendant's heightened nervousness (Burzinski testified

that at this point Black was "shaking, visibly shaking, and acting very nervous"). Finally, there was the coconut story, implausible on its face, and highly inconsistent with Black's expensive first-class ticket. These additional factors, gleaned during the constitutionally permissible initial encounter, provided the officers with reasonable suspicion to detain Black further and seek his consent to search his travel bag. *United States v. Herbst*, 641 F.2d 1161, 1167 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 292, 70 L.Ed.2d 141; *United States v. Berd*, 634 F.2d 979, 986 (5th Cir. 1981); *United States v. Elmore*, 595 F.2d at 1041.

We are unmoved by the defendant's assertion that all of his actions and responses were consistent with wholly innocent behavior, and could not therefore give rise to reasonable suspicion without subjecting every airport passenger to potential police seizure. As other courts confronted with similar situations have noted, "[i]t must be rare indeed that an officer observes behavior consistent *only* with guilt and incapable of innocent interpretation." *United States v. Price*, 599 F.2d 494, 502 (2nd Cir. 1979), *quoted in United States v. Viegas*, 639 F.2d at 45. It is for that reason that the applicable standard in determining the propriety of a *Terry* stop is not whether the defendant's acts can be construed as innocent through the exercise of exegetical speculation, but rather whether they give rise to an articulable, reasonable suspicion of criminal activity. We conclude that in this case the trial court did not err in determining that even if the retention of the documents constituted a seizure, it was justified at that point by objective and articulable factors giving rise to a reasonable suspicion that a crime had been or was being committed. We need not determine with precision therefore whether such a seizure actually occurred on the facts of this case when Kinsella turned the license and ticket over to Burzinski, and now turn our attention to the officers' search of Black's travel bag.

---

1. The officers were not relying on the DEA drug courier profile discussed in *Reid* and *Mendenhall*, but rather on the basis of the experience of drug enforcement personnel at O'Hare. Although the homemade profile based on this experience was not highly formalized, there is some indication in the record that the officers relied not only on their personal experience, but on a "booklet" listing characteristics of drug couriers traveling through O'Hare.

## III.

The defendant's final contention is that even if the seizure was not unreasonable and his consent to search his bag valid, he withdrew all consent to the search before the observation and seizure of the cocaine. He relies on *Mason v. Pulliam*, 557 F.2d 426 (5th Cir. 1977), for the proposition that consent to a search can be limited or withdrawn, and that such withdrawal must be honored by the police. We do not quarrel with that proposition as an abstract formulation of the law. It flies in the face of the facts found by the district court, however, to assert that consent was withdrawn in this case before the officers observed the cocaine.

Kinsella testified that subsequent to the grant of consent he reached into the bag, grasped a shirt and was about to remove it from the bag, when the defendant grabbed his arm, requested him to stop the search, and pulled his arm and the shirt out of the bag, whereupon the plastic bag of cocaine fell into plain view at the bottom of the bag. Burzinski testified that she was standing next to Kinsella and Black, who were kneeling next to the bag, and that she could see what appeared to be a bag of cocaine in the travel bag when Kinsella raised the shirt, shortly before Black attempted to pull Kinsella's hand from the bag. While Black testified that he had not pulled Kinsella's hand or the shirt from the bag, the court explicitly resolved whatever issue of fact the two accounts created against the defendant. It ruled that the discovery of the cocaine was the result of the defendant's initial consent, and his clumsy attempt to revoke that consent. We are not persuaded that these findings, based as they are on the demeanor and credibility of the witnesses, are clearly erroneous. In light of these facts, we hold the district court correctly applied the law of consent pursuant to the standards of *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), and of plain view, *United States v. Schire*, 586 F.2d 15 (7th Cir. 1978); *United States v. Cooks*, 493 F.2d 668 (7th Cir. 1974).

In accordance with the foregoing reasons, the judgment of the district court is

Affirmed.

SWYGERT, Senior Circuit Judge, dissenting.

This case presents two crucial questions. First, when was the defendant Black seized within the meaning of the Fourth Amendment; and, second, at that point, did the police know "specific and articulable facts" sufficient to give rise to a reasonable belief that Black had committed a crime? *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–1880, 20 L.Ed.2d 889 (1968). I believe that the majority has incorrectly analyzed both issues.

I make two preliminary observations. First, I note that the Supreme Court has never definitely articulated the concept of a Fourth Amendment seizure. The majority here adopts Justice Stewart's *Mendenhall*-test that a person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Only two Justices in *Mendenhall* explicitly accepted that test. An overly-restrictive definition of a seizure isolates police-citizen contacts from constitutional safeguards by removing them from judicial scrutiny. It, therefore, eliminates the only effective deterrent to police misconduct. *Terry v. Ohio*, 392 U.S. 1, 12, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968). Nonetheless, even accepting the *Mendenhall* standard, I believe that the majority incorrectly analyzes the seizure issue.

Second, the majority is incorrect in using the "clearly erroneous" standard of review. The majority employs this standard of review because it believes that whether the encounter between the police and Black amounted to a seizure is a factual matter. Majority opinion at 135–136. The factual findings, however, are not in dispute. The only issue is whether these facts constitute a Fourth Amendment seizure. This is a

question of law and the standard of review, therefore, is not clearly erroneous. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 44, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960); *Murphy v. Turner*, 426 F.2d 422, 423 (10th Cir. 1970); 2 Fed.Proc., L.Ed. § 3:652. The court's use of the incorrect standard of review contributes crucially to its erroneous result. The majority admits that it is a close question whether the initial contact between the police and Black was a seizure. Majority opinion at 136–137. The majority defers to the district court's legal conclusion because it finds no clear error in the factual findings. But the issue is a legal one and so the deference is inappropriate.

I

The majority holds that the initial encounter between the police and Black was neither an arrest nor an investigative stop. The police's conduct, therefore, is completely outside the reach of the Fourth Amendment and is not open to judicial scrutiny. I believe that a realistic analysis of the facts of this case cannot support this position.

Black left the plane, walked to the flight information screen, and then walked to another gate and sat down to wait for his connecting flight. After five minutes he got up to go to the washroom. Two people stopped him, identified themselves as Chicago police officers, and said that they wanted to ask him some questions. I believe that a reasonable person would not think that under these circumstances he could freely ignore the police and walk away. Police encounters that involve investigative questioning that focuses on the person being stopped are inherently coercive. Police are authority figures. A person naturally feels compelled to stay put when the police stop him and say that they want to ask him some questions that involve him. The situation would have been quite different if the police were not investigating Black or were simply engaged in ordinary conversation. Here it is undisputed that the police stopped Black specifically to investigate him. I think it is clear that Black was seized under the Fourth Amendment. *See*

*Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Palmer*, 603 F.2d 1286, 1288 (8th Cir. 1979).

The majority contends that Black was an intelligent and well educated person and would not be coerced in this situation. I agree that a defendant's lack of education or inability to speak English requires special sensitivity. It does not follow, as the majority seems to conclude, that college graduates are fair game for police interrogation without Fourth Amendment protections. The majority also notes that the incident took place in a well-lighted and spacious public concourse with other travelers present. I do not find this fact at all persuasive. O'Hare International Airport is neither a hospitable nor a comfortable environment. Being stopped there by police hardly diminishes the coercive atmosphere; if anything, it increases it.

The majority admits that prior to the initial encounter the police lacked justification for an investigative stop. Majority opinion at 137. Because I believe that the initial encounter was a seizure, the search that followed was illegal and its fruit should be suppressed.

II

Even if the initial contact were not a seizure, I still cannot accept the result. The majority admits that at a certain point the police's encounter with Black became a seizure; they never say, however, exactly when this seizure occurred. They do contend that, whenever it occurred, it was justified. I disagree.

The majority's unwillingness to state exactly when the seizure occurred produces its incorrect result. A court must determine when a seizure occurred because it is at that point that the court must evaluate the police officer's knowledge to see whether the seizure was justified. Because the majority never directly answers the seizure question, it errs on the issue of justification.

I think that it is beyond doubt that Black was seized when the police officers took his driver's license and airline ticket. I find

entirely fanciful the majority's statement that whether a reasonable person would feel free to leave under these circumstances is "extremely close." How could Black reasonably feel free to leave when the police had in their possession his airline ticket and his driver's license? Where was he to go? How was he to get there? He could not get on a plane, and he could not rent a car. He had just arrived from another city. He was alone in a large international airport, and the police had taken his travel documents. The issue is not at all close. When the officers took Black's travel documents, he was seized under the Fourth Amendment. *See Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Palmer*, 603 F.2d 1286, 1288 (8th Cir. 1979).

The crucial question, therefore, is whether at that point the police had knowledge of specific and articulable facts that gave rise to a reasonable belief that Black had committed a crime. *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. at 1868, 1879–1880, 20 L.Ed.2d 889 (1968). What specific and articulable facts did the police know? Did these facts meet the standard for investigative stops?

The majority states that the police knew that: (1) Black was the first passenger off a plane that had arrived from Ft. Lauderdale, (2) Black exited the plane speedily, and (3) Black appeared disoriented and nervous. These facts fail to meet the standard for investigative stops. It is a logical truth that every plane from Ft. Lauderdale will have a first person leave it. This fact lacks specificity and carries no weight. ("The demand for specificity . . . is the central teaching of this court's Fourth Amendment jurisprudence." 392 U.S. at 21, n.18, 88 S.Ct. at 1880, n.18.) The judgment of Black's psychological state is entirely subjective. A reviewing court must, of course, give due consideration to inferences an experienced agent reasonably draws from his observations. *Brown v.*

*Texas*, 443 U.S. 47, 52 n.2, 99 S.Ct. 2637, 2641 n.2, 61 L.Ed.2d 357 (1979). Nonetheless, the mere fact that an officer is experienced does not turn his suspicions into specific and articulable facts. Suspicions justify continued surveillance; they do not justify stopping and seizing citizens. *United States v. Buenaventura-Ariza*, 615 F.2d 29, 36 (2d Cir. 1980); *United States v. Price*, 599 F.2d 494, 500 n.7 (2d Cir. 1979).

Indeed, the majority admits that the foregoing facts would not justify the seizure of Black. It asserts, however, that the police knew three additional facts that justified the seizure. Majority opinion at 137. This assertion is incorrect because the police obtained the knowledge of these facts *after* Black was seized. This illustrates the critical importance of determining exactly when the seizure took place. The police officer's knowledge must be evaluated at that point. Knowledge acquired after a seizure has occurred cannot be used *a posteriori* to justify it. *See Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964). *Cf. Bumper v. State of North Carolina*, 391 U.S. 543, 548 n.10, 88 S.Ct. 1788, 1791 n.10, 20 L.Ed.2d 797 (1968) (search not justified by what it turns up).

In *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), the defendant arrived at the Atlanta airport early in the morning from Ft. Lauderdale (the same city from which Black arrived in Chicago). He left the plane alone. He appeared nervous and to be concealing that he was traveling with a companion. His only luggage was a shoulder bag. He looked backwards several times in the direction of the second man. The police approached him, identified themselves as agents, and asked to see his airline tickets and identification. The Court held, as a matter of law, that the agents could not have reasonably suspected the defendant of criminal activity on the basis of these observations. 448 U.S. at 441, 100 S.Ct. at 2754. I believe that *Reid* is dispositive of our case. As a matter of law, the police lacked knowledge of specific and articulable facts about Black that justified a reasonable belief that he had committed a crime.

The agent's beliefs were mere suspicions and "too slender a reed to support the seizure in this case." *Id.*

Cases from other circuits support this analysis. In *United States v. Buenaventura-Ariza*, 615 F.2d 29 (2d Cir. 1980), the defendants arrived from a source city, appeared nervous, and travelled separately in the airport although they had talked to each other when deplaning. The court held that the facts "strike us as wholly insufficient to constitute 'specific and articulable' facts supporting a reasonable suspicion that they were involved in drug trafficking." 615 F.2d at 36. The court noted that, "There must be other *objective* facts which when viewed in conjunction with nervous behavior and arrival from a source city raise the complex of conduct to a level justifying reasonable suspicion of criminal activity." *Id.* (emphasis added). In *United States v. Jefferson*, 650 F.2d 854 (6th Cir. 1981), the defendant arrived from a source city, walked quickly through the terminal, appeared extremely nervous, matched a tip from an informant, and did not claim his luggage until he was picked up by someone. The court held that these facts did not justify an investigative stop. 650 F.2d at 856–57. *See also Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. McCaleb*, 552 F.2d 717 (6th Cir. 1977).

When the officers stopped Black, questioned him, and took his travel documents, he was seized. At that point the police lacked knowledge of specific and articulable facts that justified the seizure. Because the seizure was illegal, the fruits of the search that followed should be suppressed.

I dissent.