UNITED STATES of America, Plaintiff,

v.

Jose Luis CANTERO, Defendant.

No. 82 CR 256.

United States District Court, N.D. Illinois, E.D.

Nov. 18, 1982.

Joseph H. Hartzler, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

James P. Tatooles, Chicago, Ill., for defendant.

Memorandum

LEIGHTON, District Judge.

This is a motion to suppress evidence seized from a suitcase which defendant was carrying near a baggage retrieval area at O'Hare International Airport in Chicago. The issue presented is whether he was subjected to an unreasonable search when his suitcase was opened after he was stopped at the airport by government narcotic agents. Evidence consisting of defendant's testimony and that of three government witnesses . has been heard, the testimonial conflicts have been resolved, and the court finds that the following are the material facts.

I

Chicago police officer Rosemary Burzinski, at the time in question, was assigned to the narcotics detail at O'Hare International Airport. One of her duties was to monitor incoming flights in the attempt to identify drug couriers. As a part of her assignment, she ordinarily stood in an airport concourse and observed people deplane from flights that originated in cities which have come to be known as source cities for drugs brought into and distributed within the United States. If a deplaning passenger becomes suspect, Officer Burzinski will maintain additional surveillance and sometimes stop and question that person about illicit drugs. Whenever an encounter uncovers any drugs, then an arrest and seizure will occur. Officer Burzinski has worked at O'Hare for two and one-half years, has participated in about 200 encounters, and has been involved in about 50–75 seizures. One of her co-workers was Robert Fulkerson who was also assigned to O'Hare Airport as a special agent with the United States Department of Justice as part of a Task Force to detect drug couriers. In the last two and one-half years assigned to the airport, he has participated in four to five encounters per week, and in approximately 100 arrests.

On April 12, 1982, at about 3:20 p.m., defendant Jose Cantero arrived at O'Hare on United Air Lines Flight 111 from Miami, Florida, a noted source city for cocaine. He was traveling alone in the first class sec-

tion; and was the first passenger to leave the plane. When he reached the passenger concourse, he was seen by Officer Burzinski. She had never seen him before; did not know him, nor did she have any information from anyone concerning him. Nonetheless, she decided to follow Cantero as he proceeded toward the baggage retrieval area in the lower level, meeting Agent Fulkerson on the way. The two agents rode down the escalator and noticed that Cantero looked back, making eye contact with one of them. They heard him ask a skycap where the international terminal parking lot was located. This inquiry led the two agents to conclude that, because of the high cost of parking, Cantero must have been away from Chicago only a few days. The agents kept him under surveillance, and observed that he went to the baggage retrieval rack, picked up a red Samsonite suitcase, and began walking toward the automatic door.

Just before he reached it, Fulkerson tapped Cantero on the shoulder and showed him a DEA identification badge, and asked Cantero if he could speak to him. Cantero answered, "Sure." Burzinski was a short distance away; a third agent, Officer Lowry had joined the group but was not participating in the transaction. Fulkerson, in a conversational tone of voice, asked Cantero to identify himself; he produced a valid Illinois driver's license and an airline ticket which showed an original booking for an earlier flight. After examining the documents, Fulkerson asked Cantero if he had drugs in the suitcase. Cantero said, "No." Then Burzinski and Fulkerson told Cantero that they wanted to see if there were narcotic drugs in the red Samsonite. They asked Cantero for permission to open the suitcase; Cantero refused, saying he found it embarrassing to be subjected to such treatment in the presence of the many people in the area, some coming in and out of the automatic doors. Fulkerson then suggested that they move to one side, to the right of those exiting the area; and when they did, he took the suitcase from Cantero and opened it.

Among the items which could been seen immediately were two large blue and white "Prince of Denmark" cookie cans, approximately eight inches in diameter, sealed tight with tape around the edges. They were ordinary looking; and with the exception of the tape, nothing about them suggested they contained anything but cookies. Upon seeing the two cans, Fulkerson and Burzinski asked Cantero if he would consent to an inspection of their contents. Cantero refused, saying that they contained "voodoo items". Fulkerson, then, with Burzinski joining in the conversation, told Cantero that it was necessary for them to take the suitcase to the international terminal where they had "Rebel", a trained drug-sniffing canine that would be used to determine whether the two cans contained narcotics.

Fulkerson took possession of the Samsonite; and when Cantero objected, he was told he could go with the agents to the other terminal; but that he was free to leave the airport, without his suitcase. Cantero decided to stay with the agents. The four of them then, Fulkerson leading, Lowry next, and Burzinski with Cantero along, began the walk to the international terminal, a distance away. On arrival there, Burzinski took the suitcase; and, in a separate room, exposed the cookie cans to Rebel's trained nose. She reported to her co-workers that from Rebel's reactions, the two cookie cans contained drugs. Cantero, who in the meantime had been kept under the careful surveillance of Fulkerson and Lowry, was arrested.[1] A short time later, a search warrant was obtained, the cans were searched, and in them were found 986 grams of a mixture containing cocaine. It is this evidence which defendant asks this court to suppress on the ground that his suitcase was opened at O'Hare Airport by Agent Fulkerson without a warrant, without lawful cause, and without consent. The

---

1. On April 28, 1982, defendant was charged in a one-count indictment with possession of 986 grams of a mixture containing cocaine with intent to distribute, in violation of Title 21, United States Code, Section 841(a)(1).

government asks this court to deny defendant's motion to suppress on the ground that he consented to the opening of his suitcase, in fact opened it himself.

## II

The evidence in support of the government's contention that Cantero opened his own suitcase is the testimony of Burzinski and Fulkerson. This is not a case in which it is claimed that Cantero's physical or behavioral characteristics fit a drug courier profile; nor is it one in which the government claims that at the time its agents took possession of Cantero's driver's license and airline ticket they had knowledge of specific articulable facts which gave rise to a reasonable belief that he had committed or was committing a crime. This case is one in which the government claims that Cantero, on being asked by two agents, voluntarily consented, opened his suitcase, and put in open view the two cookie cans that were later shown to contain a substantial quantity of cocaine.

▮▮▮ Consent may constitute a waiver of Fourth Amendment rights. *United States v. Fike,* 449 F.2d 191, 192, (5th Cir. 1971). It can be given in the form of words, gesture, or conduct, *United States v. Griffin,* 530 F.2d 739, 742 (7th Cir.1976); and a search conducted pursuant to consent is an exception to both the requirement of a warrant and probable cause, *United States v. Bolin,* 514 F.2d 554, 559 (7th Cir.1975). However, consent to a search is not lightly inferred and depends on the facts of each case, *United States v. Cogwell,* 486 F.2d 823, 837 (7th Cir.) *cert. denied,* 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974), the question whether a consent was voluntary being itself one of fact to be determined from the totality of all the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

▮▮▮ It is well established that when relying on consent as justification for a warrantless search, the prosecution has the burden of establishing that consent was, in fact, freely and voluntarily given. *United States v. Glasby,* 576 F.2d 734, 737 (7th Cir.) *cert. denied,* 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed.2d 159 (1978). The credibility of those who testify concerning this fact is always important and crucial; so for this reason, a court should consider the whole nexus of its sense impressions of the witnesses. *Dyer v. MacDougall,* 201 F.2d 265, 268–269 (2d Cir. 1952); *see Hall v. United States,* 465 F.Supp. 571, 574 (N.D.Ill.1979). And the demeanor of such witnesses is a highly useful, even if not an infallible method of ascertaining the truth and accuracy of their narratives. *Arnstein v. Portor,* 154 F.2d 464, 470 (2d Cir.1946); *see Sartor v. Arkansas Nat. Gas Corp.,* 321 U.S. 620, 628, 64 S.Ct. 724, 729, 88 L.Ed. 967 (1944).

This court has applied these tests of credibility to the testimony of Cantero, Burzinski, and Fulkerson. It has noticed, in the process, that Burzinski was one of the arresting officers and a witness in *United States v. Black,* a case that produced an opinion by Judge Nicholas J. Bua of this court, 510 F.Supp. 989; one for the majority of a court of appeals panel by Judge Pell, 675 F.2d 129; and a dissenting opinion by Judge Swygert, 675 F.2d 138. In its response to defendant's motion to suppress, the government submitted a legal discussion in which it argued that "[t]his case is controlled by the Seventh Circuit's recent opinion in *United States v. Black,* 675 F.2d 129 (7th Cir.1982). The facts in *Black* are virtually identical to the facts in the present case." This is no doubt true; there is a surprising similarity in some details of the facts testified to in this case by Burzinski and Fulkerson and the ones which she and her fellow agent described in *United States v. Black.*

*Black,* like Cantero in this case, was observed by Burzinski as he disembarked from a United Airline flight that originated in a Florida city considered by the DEA to be a main source of cocaine distribution in the United States. *Black,* like Cantero, according to Burzinski and her fellow officer Kinsella, was the first passenger to deplane.

He engaged in conduct which Kinsella in his testimony said was not unusual. Burzinski and Kinsella watched Black as he entered Gate F–3 and sat down without checking in. About five minutes later, Black picked up his travel bag and walked to the concourse. As he did, Burzinski and Kinsella identified themselves to him. They showed him their identification and Kinsella then asked him, in a normal tone of voice, if they could speak to him. According to Burzinski and Kinsella, Black said, "[s]ure". Kinsella asked Black if he had identification and an airline ticket. Black produced a Hawaii driver's license and a first class, one way ticket to Honolulu.

The ticket, however, was in the name of Mr. R. Plack. Kinsella asked Black why he was traveling under a fictitious name. Black offered no explanation; he merely shrugged his shoulders in response. Kinsella then asked Black what he had been doing in Florida. Black replied that he had been in Florida surfing for the past three months and, after he ran out of money, he harvested coconuts to earn money for his return ticket to Hawaii. At that point, Kinsella suggested that the two move a few feet away from the area of the initial stop in order to avoid blocking traffic on the concourse. Kinsella, at about this time, handed Black's license and ticket to Burzinski. The documents were never returned to him.

Black appeared to both Burzinski and Kinsella to be extremely nervous. Kinsella asked Black what was in his travel bag; Black said it contained books, clothes, and toilet articles. Kinsella asked Black, in a normal tone of voice, if he would consent to a search of the travel bag. Black responded in the affirmative; Kinsella specifically informed Black that he did not have to consent to the search. Then, without responding further, according to Burzinski and Kinsella, Black immediately knelt down, unzipped the bag, took out a book and handed it to Kinsella. Kinsella inspected the book, put it down on the floor next to the bag and then reached into it and took out a shaving kit. Kinsella opened the kit, inspected its contents, and then placed it on the floor next to the bag. Black said noth-

ing and made no attempt to stop Kinsella from further inspection.

Kinsella then reached into the travel bag again and grasped a shirt. He felt an object through it. As he began to withdraw the shirt from the bag, Burzinski who was standing across from her kneeling partner, could see a clear plastic bag containing white powder wrapped in the folds of the shirt. The plastic bag was itself wrapped in a torn paper bag. Because of the way the bag containing the white powder was wrapped in the folds of the shirt, it was not visible to Kinsella as he brought the shirt to the top of the open travel bag. Just as Kinsella's hand reached the top of the travel bag, Black grabbed Kinsella's wrist, and while pulling Kinsella's hand out of the travel bag, told Kinsella not to search any further. As Black yanked Kinsella's hand out of the travel bag, the plastic bag containing the mixture fell out of the shirt to the bottom of the travel bag. Kinsella saw the plastic bag containing the white powder in plain view on the bottom of the travel bag and told Black he was under arrest. It was later determined that the plastic bag contained 540 grams of a mixture containing cocaine. Black was indicted; and when he appeared before Judge Bua he moved to suppress the evidence seized at the airport. The motion was denied.

A reading of Judge Bua's opinion, that of Judge Pell for the panel majority in the court of appeals, and Judge Swygert's dissent, conveys the teaching that in an airport investigative stop of a plane passenger, what police officers do with the passenger's identification documents can have important consequences for Fourth Amendment purposes. When Burzinski testified in this case, this court asked her if she had followed the Black case after her testimony before Judge Bua; she said that she had. She was then asked whether she knew that Black had appealed his conviction; she said she did. Then this court asked her whether she had read the court of appeals opinions in *Black* which had been issued on April 6, 1982, six days before Cantero was arrested at O'Hare Airport. She hesitated; and then said, "I may have."

From this court's sense impressions of this witness, and observing her demeanor and manner while answering questions put to her, it finds that Burzinski had read the court of appeals opinions before she became a witness in this case; and, in addition, she and Fulkerson had discussed the parameters of *Black* with assistant United States attorneys in preparing for their testimony. Both Burzinski and Fulkerson have testified that when Cantero was asked for his identification, and he produced his Illinois driver's license and airplane ticket, they examined the two documents and returned the driver's license to him but kept the airline ticket. Cantero has denied that either document was returned to him. He states under oath that Fulkerson kept the documents and had them in his possession up until the time of the arrest at the international terminal.

At two points, Cantero is corroborated by the government's evidence. First, both Fulkerson and Burzinski say that after seeing the two cookie tins, and asking Cantero for permission to examine their contents, he was told by them that he was not under arrest; and that when Fulkerson took possession of the suitcase to carry it to the international terminal, where they could use Rebel's trained nose, Cantero was told he was free to leave the airport, or if he chose, go with them with the suitcase. Second, when, after his arrest, Cantero was delivered to the Chicago Metropolitan Correctional Center for processing, it was either Fulkerson, Burzinski, or another DEA agent who had Cantero's driver's license and produced it for the inventory clerk.

This court finds it unbelievable, and untrue, that two experienced drug enforcement agents would stop a total stranger, take from him a suitcase which they believed contained narcotic drugs, and then tell the suspected suitcase owner that he was free to leave their presence without their having ready at hand means by which they could locate him later and arrest him if

their suspicions were substantiated.[2] It is evident, therefore, that at the time Burzinski and Fulkerson told Cantero he was free to leave the airport, they did so because they had in their possession his Illinois driver's license and his airline ticket which they could use to trace him in the event the time came for them to arrest him. For these reasons, the court finds that when Cantero handed to Fulkerson his driver's license and plane ticket, Fulkerson kept the documents in his possession. And when, moments later, Cantero's suitcase was opened, it was Fulkerson, not Cantero, who opened it. At the time that Fulkerson decided to retain possession of Cantero's travel documents, and when he opened the suitcase, neither he nor Burzinski had knowledge of any specific and articulable fact which could support a reasonable belief that Cantero had committed a crime.

### III

From the facts shown by the evidence, this court concludes that the initial contact which Fulkerson and Burzinski had with Cantero, up to and including the point where Fulkerson retained possession of Cantero's driver's license and airplane ticket, was lawful, and was not a seizure triggering the protections of the Fourth Amendment. *United States v. Black,* 675 F.2d 129, 135 (7th Cir.1982). It has long been the law in Illinois, consistent with the Bill of Rights in the federal constitution, that a peace officer can always, without violence or coercion, approach a citizen, disclose his official purpose, and inquire of the citizen his name, his reason for being where he is, and what he is about. *People v. Howlett,* 1 Ill.App.3d 906, 274 N.E.2d 885 (1971); see *People v. Henneman,* 367 Ill. 151, 10 N.E.2d 649 (1937).

However, when in this case Fulkerson took Cantero's airplane ticket and driver's license and kept them from him, Cante-

---

**2.** The suitcase did not have an owner's tag or label from which Burzinski and Fulkerson could have learned Cantero's address; nor, as far as the government has shown, did the con-

tents contain any item that would have furnished the government agents with information they could use to find Cantero.

ro was seized within the meaning of the Fourth Amendment. See *Brown v. Texas,* 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); cf. *United States v. Palmer,* 603 F.2d 1286, 1288 (8th Cir.1979). A person is seized in a constitutional sense when, in view of all the circumstances surrounding the incident, a reasonable person would believe that he is not free to leave. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). *United States v. Jefferson,* 650 F.2d 854, 857 (6th Cir.1981); *United States v. Viegas,* 639 F.2d 42, 44 (1st Cir.) *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981). This was Cantero's situation.

He had an automobile parked in the international terminal parking lot; under Illinois law, he could not drive it from the airport without possession of his license. The seizure of these documents from him was unlawful because at the time it was effected neither Fulkerson nor Burzinski had knowledge of any specific and articulable fact sufficient to give rise to reasonable suspicion that Cantero had committed or was committing a crime. *United States v. Brignoni-Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); cf., *United States v. Black,* 510 F.Supp. 989, 993 (N.D.Ill.1981), aff'd, 675 F.2d 129 (7th Cir. 1982).

The opening of Cantero's suitcase by Fulkerson was a government search requiring application of the Fourth Amendment. *United States v. Newton,* 510 F.2d 1149, 1153 (7th Cir.1975). Except as incident to a lawful arrest or on invitation or consent, a search without a warrant, of portable personal effects in the immediate possession of their owner is illegal. *Faubion v. United States,* 424 F.2d 437, 440 (10th Cir.1970). There was no warrant in this case; the search was not incident to a lawful arrest; and Cantero did not give consent or invite it. He was subjected to an unreasonable search when his suitcase was opened by Fulkerson. *United States v. Rodriguez,* 525 F.2d 1313 (10th Cir.1973); see *United States v. Lonabaugh,* 494 F.2d 1257 (5th Cir.1973);

cf. *United States v. Garay,* 477 F.2d 1306 (5th Cir.1973). Therefore, his motion to suppress is granted, and the evidence consisting of his airline ticket, Illinois driver's license, the red Samsonite suitcase, the two large black and blue "Prince of Denmark" cookie cans, and their contents, the 986 grams of a mixture containing cocaine, will be refused admission in evidence in any trial of the charges in this case. An appropriate order will be entered.

So ordered.