UNITED STATES of America, Plaintiff,

v.

Louis A. GIULIANI, Defendant.

No. 83 CR 157.

United States District Court,
N.D. Illinois, E.D.

Jan. 11, 1984.

Carol A. Brook, James Holloway, Federal Defender Program, Chicago, Ill., for defendant.

Robert J. Hackman, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

### Memorandum

LEIGHTON, District Judge.

This is a motion to suppress evidence filed pursuant to Rule 41(f), Fed.R.Crim.P., the procedure as provided by Rule 12(b)(3). It presents to this court another case of an airplane passenger arriving at O'Hare International Airport in Chicago who complains that agents of the Drug Enforcement Administration, in violation of his Fourth Amendment rights, subjected him to an unreasonable search and seizure. Having heard the evidence, the court agrees with defendant; and therefore, grants his motion to suppress.

### I

Special Agent Karl Ekman of the Drug Enforcement Administration was on duty at O'Hare Airport on February 25, 1983. He has been with DEA for about thirteen years (Tr. 9/2 at 18),[1] but he was new to the O'Hare assignment. (Tr. 9/2 at 72–73). At approximately 1:30 p.m. that afternoon, Ekman was in the vicinity of Gate H–11B waiting for the arrival of Delta Airlines Flight 1136 from Fort Lauderdale and Miami, Florida. He saw defendant Giuliani leave the airplane after about half of the passengers had preceded him (Tr. 9/2 at 19). Giuliani was suntanned (Tr. 9/2 at 45–46), was wearing a light beige sportcoat, a maroon shirt, and bluejeans (Tr. 9/2

---

**1.** The suppression hearing in this case was held on two separate days. Defendant Giuliani testified on July 29, 1983 and the transcript of his testimony is referred to as (Tr. 7/29 at —).

The government's witnesses testified on September 2, 1983, and their testimony is referred to as (Tr. 9/2 at —).

at 19–20). Prior to his seeing Giuliani on this occasion, Ekman had never seen him before (Tr. 9/2 at 49–50); and although Ekman knew that 95% of the cocaine imported into the United States comes through the Miami-Fort Lauderdale area (Tr. 9/2 at 19), he had no information about Giuliani (Tr. 9/2 at 49–50), nor could he articulate any reason to believe that Giuliani had any part in the narcotics traffic. Nonetheless, Ekman continued to observe Giuliani as he left the gate area (Tr. 9/2 at 21).

Ekman viewed Giuliani from a point at about ten feet from the gate (Tr. 9/2 at 20). He saw him walk 20 to 25 feet down the concourse, pass a bank of telephones, stop for two or three seconds, look back toward Gate H–11B, and glance around (Tr. 9/2 at 21). Giuliani was walking at a slower pace than the other passengers; he paused and looked around several times (Tr. 9/2 at 21). He proceeded to the ticket counter, and then took the escalator that empties into the American Airlines baggage area, 100 to 150 feet from the Delta Airlines baggage retrieval point. After again looking around, Giuliani made his way slowly to the place where he was to retrieve his bag. Ekman followed him throughout his passage from the departure gate to the baggage area from an average distance of approximately 30 feet (Tr. 9/2 at 22–23).

Giuliani proceeded to the luggage belt; Ekman observed that he repeatedly looked around at other people in the area, rather than at the baggage belt (Tr. 9/2 at 25). This behavior, to Ekman, differed from that of other passengers who, according to Ekman, looked at the baggage belt for their bags more than they looked around them (Tr. 9/2 at 26). Giuliani then picked up a full sized dark blue bag; he walked to the center of the baggage area where he encountered a Delta baggage employee. At this time Ekman was two or three feet from Giuliani (Tr. 9/2 at 26). When the Delta employee asked Giuliani to produce his baggage claim ticket, Giuliani flinched and appeared to Ekman to be startled. The baggage checker asked Giuliani a second time for his baggage claim ticket which

Giuliani produced. He was then cleared by the Delta employee and began to walk toward the American Airlines baggage claim area (Tr. 9/2 at 27).

After Giuliani walked 20 to 25 feet, retracing the route by which he came to the baggage area, Ekman approached him from behind and asked if he could speak with him, showing him his credentials. Giuliani agreed and asked, "What's it all about?" (Tr. 9/2 at 28; 7/29 at 28). Ekman did not touch defendant, nor physically stop him at this first encounter (Tr. 9/2 at 30). He informed Giuliani that he was a narcotics agent for the DEA, assigned to the airport; Ekman was dressed in casual clothes, he was carrying a weapon whose holster clip Giuliani could notice (Tr. 7/29 at 50). Giuliani then showed Ekman his airline ticket, for one way and had been paid for by cash (Tr. 9/2 at 55). Ekman had difficulty reading the name and asked Giuliani what was his name; Giuliani responded, "Tony Ciao" which Ekman wrote on a newspaper. At this point, Giuliani again asked Ekman for his credentials which was produced (Tr. 9/2 at 28–29). Ekman returned the ticket to Giuliani (Tr. 9/2 at 31); and in the conversation that ensued, told him, in response to his questions, that he, Ekman, did not have a tip on him nor was he under arrest (Tr. 9/2 at 29).

Ekman then asked Giuliani if he could look into the bag he was carrying; defendant told Ekman that he had business papers in it which he did not want Ekman to see (Tr. 9/2 at 29). For a third time, Giuliani requested of Ekman his credentials, which were produced. Ekman asked Giuliani where he lived; and he responded that he lived in Chicago Heights, but would not give Ekman any further information (Tr. 9/2 at 29, 60). When asked if he had other identification, Giuliani said, "I didn't carry any this time." (Tr. 9/2 at 29). Ekman then told Giuliani that he might want a dog to sniff his bag; Giuliani responded by saying, "Do what you have to do." Ekman then said, "I'm going to call for a dog", and Giuliani repeated, "Do what you have to do." (Tr. 9/2 at 30). Once again Giuliani

asked Ekman, "Well, am I under arrest?" Ekman replied, "No, but I would like to know where you live, because if I have the dog smell the bag and the bag is clean, I have to get it back to you somehow. I will ship it to you." Giuliani then said, "Okay, I'll stay." (Tr. 9/2 at 31).

At this point, Giuliani and Ekman had moved over to a wall where a courtesy telephone was located (Tr. 7/29 at 29–30; 9/2 at 30–32). After some conversation between them concerning Giuliani's business and his reason for going to Florida, Giuliani refused to give Ekman any further personal information, stating that he did not have to tell Ekman anything further; and that he believed Ekman was infringing on his rights (Tr. 7/29 at 36; 9/2 at 29). Ekman was not satisfied with Giuliani's responses and asked him if he had any other identification (Tr. 9/2 at 29). Giuliani responded he had none on him (Tr. 9/2 at 29). Ekman again told Giuliani he was going to call for a dog to come and sniff the bag (Tr. 9/2 at 29–30, 62), although he knew that Giuliani had not violated any law or "done anything that appeared to [him] to be criminal behavior." (Tr. 9/2 at 72). By this time, Ekman's encounter with Giuliani had lasted fifteen to twenty minutes.

Ekman then telephoned the DEA office (Tr. 9/2 at 31). He told a DEA agent that he "was interviewing a suspect ... who did not have any identification and had aroused his suspicion and he had asked him for consent to search of [sic] and the gentleman declined..." (Tr. 9/2 at 86). Ekman requested that a dog be brought to him (Tr. 9/2 at 62), a request overheard by Giuliani (Tr. 7/29 at 38). About five minutes later, two DEA agents, Bob Fulkerson and Ken Labik, arrived (Tr. 9/2 at 34). Before he made the call, Ekman told Giuliani that although he was not under arrest, his address was needed because he, Ekman, would return the bag to him if the results of the dog sniff were negative (Tr. 9/2 at 31).

At the time he joined Ekman, Fulkerson knew that Giuliani had been exercising his right not to respond to the questions put to him (Tr. 9/2 at 88); nonetheless, he began asking Giuliani the same questions he had previously refused to answer (Tr. 7/29 at 40; 9/2 at 77). In response to Fulkerson's questions, Giuliani repeated that he had no identification. Fulkerson walked around Giuliani and noticed a bulge in his sport coat and asked what it was. He asked Giuliani about "what appeared to me to be a driver's license or an ID card." (Tr. 9/2 at 89). Fulkerson then reached into Giuliani's back pocket and pulled out what turned out to be an ID case and looked through it (Tr. 7/29 at 40). He saw that the driver's license bore the name Louis Anthony Giuliani. The license was either kept by one of the agents or returned to Giuliani.

He was again asked what he was doing, and what was in his bag (Tr. 7/29 at 41). Giuliani again refused to respond. Fulkerson then told him that they were going to have a dog sniff his bag; and that if the results were negative he would be free to go, but if they were positive, he would be under arrest (Tr. 7/29 at 49). At this time, at about 2:20 p.m., Labik announced the arrival of the customs dog (Tr. 9/2 at 38). Ekman and Labik then took Giuliani's bag from him, carrying it behind the baggage claim area where a "line-up" of suitcases and bags, including Giuliani's, was presented to the customs dog; it growled and bit at Giuliani's, a reaction indicating the presence of narcotics (Tr. 9/2 at 38–39). The agents then returned and placed Giuliani under arrest (Tr. 9/2 at 40). He was transported to the DEA office at O'Hare and searched (Tr. 9/2 at 40–41). That evening, a warrant was obtained based on the dog's positive reaction to the bag, and it was opened (Tr. 9/2 at 41). Inside were found five plastic bags containing cocaine (Tr. 9/2 at 42).

## II

### A

In urging grant of his motion to suppress, Giuliani contends that on the day he arrived at O'Hare Airport from Florida, he was subjected to an unconstitutional sei-

zure either (1) when Ekman told him he was going to detain his suitcase in order to have it sniffed by a customs dog; or (2) at the time agents Fulkerson and Labik arrived on the scene, questioned him, and then took his suitcase; or (3) at the time Fulkerson seized his ID case containing his driver's license. Giuliani argues that no reasonable or articulable facts existed at any of these points of time to have justified the seizure. Therefore, he insists that all subsequent information received from him, including the name on his driver's license, were fruits of the unconstitutional seizure, tainted by his illegal detention. He submits further that the dog sniff and the resultant search warrant which yielded the cocaine in this case, were the direct results of the illegal seizure and detention imposed on him by agents of the government and must be suppressed. In the alternative, Giuliani argues that Ekman's decision to seize his bag, as opposed to his person, was not based on any reasonable suspicion or reasonably articulable facts; therefore, all information discovered subsequent to that decision must be suppressed.

### B

The government responds with the contention that prior to the customs dog sniff of Giuliani's bag, and the probable cause that resulted therefrom, Giuliani was not arrested but in fact was told several times that he was free to leave the airport. It is insisted that from the time Ekman began observing Giuliani when he deplaned at O'Hare, and to the moment he was arrested on probable cause created by the reaction of the customs dog to the suitcase, Giuliani was told by Ekman and later by Fulkerson that the agents only wanted his identification so that they could return his suitcase to him if it was found clean of narcotics. The government argues that even if it were decided that Giuliani had been the subject of a seizure prior to his arrest, all of the actions of the agents were based on articulable suspicion that justified their actions. Giuliani, according to the government, had been seen by Ekman when he arrived at O'Hare Airport on a

Delta Airlines flight from Fort Lauderdale and Miami, Florida where nearly 95% of the cocaine coming into the United States passes; he walked at a slower pace than other passengers, pausing and looking around often; he passed a bank of telephones, stopped for two or three seconds to look around and to look back toward the gate where he had arrived; he walked without using the telephones; that rather than going to the Delta baggage area, he took an escalator to the American Airlines baggage retrieval point; and, after looking around again, he slowly walked to the Delta area where passengers could retrieve their bags or suitcases. According to the government, this behavior by Giuliani differed from that of other passengers and thus justified the actions taken by Ekman.

In addition, the government contends that when in their first encounter, Ekman told Giuliani that "I'm going to have the dog sniff the bag...," Giuliani never objected; rather, he consented by saying, "Do what you have to do." Thus, it is argued, even if Ekman's initial comment about calling for a dog triggered a seizure of the bag, Giuliani consented to such a seizure. For these reasons, he cannot claim a violation by the agents of his Fourth Amendment rights; nor is he entitled to suppression of the evidence obtained from him.

### III

■ It appears that today, if a person, no matter who he may be, arrives at a large American airport after a jet flight from the Miami-Fort Lauderdale area in Florida, he stands a good chance of being followed by agents of the Drug Enforcement Administration for no other reason than that he stopped and looked around in the airport concourse. See *Wilson v. Superior Ct. of Los Angeles Cty.*, 34 Cal.3d 777, 195 Cal.Rptr. 671, 670 P.2d 325 (1983). The fact that a jet flight over several hundred miles at 35,000 feet requires an arriving airplane passenger time to adjust to an airport terminal does not occur, either to those who invent airport surveillance techniques, or to those who administer them.

In the context of such airport surveillance, courts have looked at a variety of factors in determining whether a given police-citizen encounter constitutes a seizure. The inquiry must focus on (1) the conduct of the police; (2) the person of the individual citizen; and (3) the physical surroundings of the encounter. *United States v. Moya*, 704 F.2d 337, 341 (7th Cir.1983). The questions involved are highly factual ones, heavily dependent on the circumstances of each case. *United States v. Black*, 675 F.2d 129, 134 (7th Cir.1982). And determining whether a seizure has occurred requires an analysis that will ascertain if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).

The state of being "free to leave"; that is, the enjoyment of freedom, is the most fragile facet of human existence. Nothing affects it more destructively than the assertion of a stranger that he possesses the lawful authority of the government to look into the personal belongings of an individual. See *United States v. Berry*, 670 F.2d 583, 596 (5th Cir.1982). Therefore, one need not be a behavioral scientist to see that when Ekman told Giuliani, after he was refused permission to inspect the suitcase, that he was going to call a customs dog to sniff it, Giuliani was put in a position where he reasonably could have believed that he was not free to leave the airport.

In *United States v. Place*, — U.S. —, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), for example, an airline passenger on arrival at LaGuardia Airport in New York was approached by federal narcotic agents who asked but were refused consent to search his luggage. One of the agents told him that they were going to take the luggage to a federal judge to try and obtain a search warrant, and that the traveler was free to accompany them. In delivering the opinion of the court, Justice O'Connor said, "[t]here is no doubt that the agents made a 'seizure' of Place's luggage for the purposes of the Fourth Amendment when, following his refusal to consent to a search, the agent told Place that he was going to take the luggage to a federal judge to secure the issuance of a warrant." 103 S.Ct. at 2695. In this court's judgment, there is no difference between telling a traveler that a federal judge was going to be asked to issue a warrant for the search of his luggage, and making a phone call for a customs dog to sniff an arriving airplane passenger's suitcase. In both circumstances there is a seizure within the meaning of the Fourth Amendment to the constitution of the United States.

But even if it were not a seizure when Ekman told Giuliani that he was going to call for a customs dog to sniff the suitcase, certainly a seizure of the bag was accomplished by Fulkerson and Labik when they took it from Giuliani to put it in the suitcase lineup. When DEA agents take possession of an arriving airline passenger's suitcase, there is a seizure. See *United States v. Sanders*, 719 F.2d 882, 886 (6th Cir.1983). It is a fundamental principle of Fourth Amendment law that authorities may not seize property without first obtaining a warrant based on probable cause, particularly describing the items to be seized. There are, of course, limited exceptions to the warrant requirement. For instance, if agents have articulable suspicions that a suitcase is being used for the commission of a crime, they can lawfully detain it, on less than probable cause, for a brief investigation to confirm their suspicions. *United States v. Place*, — U.S. —, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983).

Articulable suspicions, however, cannot rest on the mere refusal of an arriving airplane passenger to either identify himself or to produce identification. It has long been the law that a peace officer can always, if he acts without violence or coercion, approach a citizen, disclose his official purpose, and inquire of the citizen his name, his reason for being where he is, and what he is about. *Florida v. Royer*, —

U.S. ——, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *United States v. Cantero*, 551 F.Supp. 397, 402 (N.D.Ill.1982). No violation of the Fourth Amendment occurs because "[t]he person so questioned need not answer any questions and is legally free to ignore the officer, or walk away." *United States v. Woods*, 720 F.2d 1022, 1026 (9th Cir.1983). Therefore, Giuliani's unwillingness or inability to produce identification requested of him by the agents did not justify their taking his suitcase from him in order to put it in a line-up for the customs dog to sniff. None of Giuliani's actions, as described by the agent: the fact that he traveled from a so-called "source city," his answers to questions put to him by Ekman and Fulkerson, and other factors which might have been abnormal, were, by themselves, enough to constitute either articulable suspicions or probable cause for the seizure of the suitcase. *Cf. United States v. Place*, 660 F.2d 44, 49 (2d Cir.), *aff'd* —— U.S. ——, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

For these reasons, this court rejects the government's argument that the agents had articulable suspicions that Giuliani's suitcase was being used in some criminal activity. Nor can this court accept the government's argument that Giuliani consented to the seizure of his suitcase when he said to Ekman, "Do what you have to do." The burden of proving that the necessary consent was obtained and that it was freely and voluntarily given is on the government; this burden is not satisfied by showing a mere submission to a claim of lawful authority. *Florida v. Royer,* —— U.S. ——, ——, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). Consent is not lightly inferred and depends on the facts of each case, *United States v. Cogwell*, 486 F.2d 823, 837 (7th Cir.), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974); the question whether a consent was voluntary being itself one fact to be determined from the totality of all the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879–80, 64 L.Ed.2d 497 (1980). Therefore, this court concludes that there was no consent

by Giuliani; nor was there articulable suspicions that constitutionally justify the actions of the agents.

**IV**

These conclusions make it unnecessary for this court to decide whether Giuliani was seized when Fulkerson took the ID case from him. It is true that "in an airport investigative stop of a plane passenger, what police officers do with the passenger's identification documents can have important consequences for Fourth Amendment purposes." *United States v. Cantero, supra*, at 401. But in this case, Giuliani's ID case was returned to him; it did not play any part in the seizure of his suitcase. Accordingly, an order will be entered suppressing the evidence taken from Giuliani when he arrived at O'Hare Airport on February 25, 1983; the suppression will include his suitcase and the contents which the government intends to use in the prosecution of this case.