**UNITED STATES of America, Plaintiff,**

v.

**Frank Anthony RUFFINO, Defendant.**

**No. 84 CR 28.**

United States District Court,
N.D. Illinois, E.D.

July 30, 1984.

Robert A. Novelle, Serpico, Novelle, Dvorok & Navigato, Ltd., Chicago, Ill., for defendant.

Robert B. Breisblatt, U.S. Atty., Chicago, Ill., for plaintiff.

Memorandum

LEIGHTON, District Judge.

This one-count indictment charges defendant Frank Anthony Ruffino with a violation of federal narcotic laws. He moves to suppress evidence which he alleges was taken from his person following an unconstitutional search of his carry-on bag at the O'Hare International Airport. The government, however, contends that defendant consented to the search about which he now complains.

Evidence has been heard, oral and written submissions of the parties have been made to the court; the only issue to be resolved is whether the government has sustained its burden of proving that when defendant's carry-on bag was searched, it was with his consent. This issue arises from the following facts.

I

On February 9, 1982 at about 7:10 p.m., Special Agent Robert Fulkerson, two Chicago police officers Rosemary Burzinski and Thomas Kinsella, all assigned to the Chicago O'Hare Airport Drug Task Force, were watching passengers deplane from a Northwest Orient Airline flight which had originated in Tampa, Florida, a city considered a source of narcotics by the Drug Enforcement Administration. Two of these deplaning passengers were defendant and his cousin, Scott Ruffin. The agents had no information, reliable or otherwise, that any passenger on the plane was in possession of contraband, or that defendant or his cousin possessed any drugs.

The three agents were on special assignment; their purpose, under instructions of their superiors, was to observe incoming passengers from source cities, stop, interrogate them, and elicit consent so that they could search the passengers for drugs. They had done this on a number of occasions, in excess of one hundred times before February 9. With this purpose in mind, they kept defendant and his cousin under observation and saw that the two

men were carrying carry-on bags, the defendant a red-trimmed one.

Then, the agents followed defendant and his cousin to the Eastern Airlines baggage claim area located on the street level of the terminal. There, defendant turned toward the exit doors; his cousin proceeded a short distance away. At this point, none of the agents had what any of them considered was probable cause to search either defendant or his cousin. Fulkerson approached defendant and displayed his credentials. Kinsella followed Ruffin and identified himself. Burzinski was some distance but nearer Fulkerson and defendant. Neither Kinsella nor Burzinski heard what transpired between defendant and Fulkerson.

It was defendant's testimony that Fulkerson approached him from behind, grabbed his left elbow so as to stop his movement, and announced his office, displaying his credentials; that the agent told him there was a tip that he was carrying drugs and he wanted to talk with him about this information. Defendant states that Fulkerson asked him if he was carrying drugs; and, according to defendant, asked for identification and his airline ticket which defendant produced showing his proper identification. Fulkerson, according to defendant, continued to interview and thus detain him; he asked about defendant's purpose in Chicago which defendant answered telling him he had been in business in Florida, which he had just sold, and was in Chicago to visit family and friends. Defendant states that Fulkerson repeated the statement about the tip he claimed existed about defendant carrying drugs. He states that Fulkerson told him he wanted to look into the carry-on bag which by this time was on the floor of the baggage retrieval area. Defendant swears that Fulkerson reached for the bag, grabbed it, and started going through it; that he, defendant, did nothing to resist Fulkerson or object to the search because he never was told by Fulkerson that he could refuse to allow search of the bag. Defendant states that Fulkerson never told him either that he was not under arrest, or that he was free to leave the airport terminal.

It was Fulkerson's testimony that he approached defendant by moving alongside of him and displaying his credentials; that he asked defendant if he could talk with him and defendant agreed. Fulkerson swears that he asked defendant for identification which was produced in the form of an airline ticket and driver's license. These Fulkerson said he examined and returned to defendant, asking him the purpose for his trip to Chicago. Fulkerson states that he told defendant he was not under arrest but asked him if he could search the carry-on bag; and defendant, according to Fulkerson, said that the search could be made. Thereupon, he searched the carry-on bag and found a box containing a "Deering Preparation System." Fulkerson said he opened the box and found a small strainer with a white residue about which he asked defendant who said that it was cocaine. Then, according to Fulkerson, he placed defendant under arrest, read him his constitutional rights, and in a search that followed, the cocaine, which is the subject of the charge in this case, was found in defendant's boot.

## II

Since the government meets defendant's motion to suppress with the contention that on the occasion in question he consented to a search of his carry-on bag, it has "[t]he burden of proving that the necessary consent was obtained and that it was freely and voluntarily given...." *United States v. Giuliani,* 581 F.Supp. 212, 218 (N.D.Ill.1984); see *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). This burden is not satisfied by a showing of mere submission to a claim of lawful authority. *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 329, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920 (1979); *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968). The consent claimed to have been obtained, must be proved by clear and positive testimony; it must be unequivocal, specific and intelligently given, uncontami-

nated by any duress or coercion. *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir.1977). Whether consent to a search was voluntarily given is a question of fact to be determined from the totality of all the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); *United States v. Cantero*, 551 F.Supp. 397, 400 (N.D.Ill. 1982).

This being so,

> [T]he fact finding required with regard to airport stops must involve distinguishing nuances of tone and language— whether a phrase was worded as an order or a question, whether a question was so peremptory as to be a command in all but punctuation—that are subject to easy distortion or poor recall by parties and that hence might allow covert coercion easily to escape a casual review by a court.

*United States v. Berry*, 670 F.2d 583, 596 (5th Cir.1982). The psychological peculiarities of airport stops led the court in *Berry* to observe that while

> they can be conducted in a fashion that prevents coercion of the individual stopped, we also note that the very nature of such stops may render them intimidating. The nervousness that air flight often engenders, the need quickly to make connections for continuing one's journey, the mere surprise from being accosted in a crowded airport concourse by a law enforcement officer for no apparent reason, and the pressure to cooperate with police to avoid an untoward scene before crowds of people, all make it easy for implicit threats or subtle coercion to exert tremendous pressure on an individual to acquiesce to the officer's wishes. In such a situation it would be easy to misinterpret acquiescence to an officer's demands as consent; acquiescence cannot, of course substitute for free consent. 670 F.2d at 596.

Therefore, because of these nuances of meaning, this court keeps in mind that

> The credibility of those who testify concerning [the facts touching on consent] is

always important and crucial; so for this reason, a court should consider the whole nexus of its sense impressions of the witness. *Dyer v. Mac Dougall*, 201 F.2d 265, 268–69 (2d Cir.1952); see *Hall v. United States*, 465 F.Supp. 571, 574 (N.D.Ill.1979). And the demeanor of such witnesses is highly useful, even if not an infallible method of ascertaining the truth and accuracy of their narratives.

*United States v. Cantero*, 551 F.Supp. 397, 400 (N.D.Ill.1982). The tests relevant to a determination of credibility are the nature and character of the testimony, "inconsistencies, ... and discrepancies [of a witness'] testimony or between the testimony of different witnesses, [or any] contradictory testimony." *Young Ah Chor v. Dulles*, 270 F.2d 338, 341 (9th Cir.1959); *cf. Roberto v. Aguon*, 519 F.2d 754, 757 (9th Cir.1975).

### III

■ In this proceeding, these tests will be applied solely to the testimony of defendant and Fulkerson; they are the only persons, of the five involved, who claim to know what occurred during the crucial moments at O'Hare when, the government contends, defendant consented to the search of his carry-on bag. Their testimony is in irreconcilable conflict; therefore, this court is entitled to narrow the question to one of credibility. *United States v. McCorkle*, 413 F.2d 307, 310 (7th Cir.1969).

Defendant has testified that after Fulkerson confronted him near the Eastern Airlines baggage retrieval area, he dropped his carry-on bag to the floor; that he denied he had any drugs in his possession when Fulkerson told him there was a tip he was carrying drugs; that he knew a search of the bag would surely result in a search of his person and discovery of what he had secreted in his boot; that Fulkerson never told him he could decline being interviewed or refuse search of the bag; and that Fulkerson told him he wanted to look into it, and then reached down, grabbed the bag, and went through its contents; that he did not resist or object because from the man-

ner in which Fulkerson stopped and interrogated him, defendant said he believed he was under arrest and had no alternative but to "just let him do what he was going to do."

Of course, defendant's credibility must be judged with the point in mind that he has an interest in the outcome of this proceeding; therefore, he was a biased witness. *Saladino v. Winkler*, 609 F.2d 1211, 1214 (7th Cir.1979). But his insistence that, under the circumstances, he would not have consented to the search finds support in an oft cited observation of an experienced judge; namely, that "no sane man who denies his guilt would actually be willing that police search his room for contraband which is certain to be discovered." *Higgins v. United States*, 209 F.2d 819, 820 (D.C.Cir.1954) [1]; see *Leavitt v. Howard*, 332 F.Supp. 845, 855 (D.Rhode Is.1971); *Porter v. Ashmore*, 298 F.Supp. 951, 956–57 (D.So.Car.1969); *State v. Williams*, W.Va.Ct.App., 249 S.E.2d 758, 763 (1978). Thus, referring particularly to Fulkerson's claim of consent, defendant relies on the principle that a court may not accept the testimony of a witness which is contrary to common sense and human experience. *United States v. Ortiz*, 331 F.Supp. 514, 520 (D.Puerto Rico 1971). This court agrees. And, accordingly, has subjected Fulkerson's testimony to the scrutiny it deserves.

Almost immediately into this process, the court's attention has been attracted to the details of Fulkerson's testimony which raise questions of credibility. He swears that his decision, and that of his fellow agents, Burzinski and Kinsella, to subject defendant and his cousin to surveillance were entirely without any preplanning, communication or coordination of information among the three of them. As innocuous as this fact may be, it is difficult to believe. Common sense tells us that when three government agents follow two men

through an airport concourse, they either act in accordance with prearranged plans, or they do it by instantaneous coordination.

More astounding, however, is Fulkerson's testimony that he and Burzinski followed the men to a point where defendant used a telephone. According to Fulkerson, he and Burzinski took phone booths on each side of defendant that enabled them to overhear defendant's conversation with a person who, apparently, defendant had expected to meet on arrival at O'Hare. Fulkerson swears that defendant said something about being hungry and wanted supper, and then added that he "had the stuff with him and would see him [the friend] later on."

This was an important occurrence; indeed, it could be described as an investigative scoop which one drug enforcement agent would be anxious to share with his cooperating agents. It has been said that the word "stuff" carries with it "a customary meaning peculiar to the illegal narcotics trade"; *Parente v. United States*, 249 F.2d 752, 754 (9th Cir.1957); and that, in the jargon of narcotics peddlers, the word means illicit drugs, *United States v. Lugo-Baez*, 412 F.2d 435, 437 (8th Cir.1969). It is reasonable to assume that Fulkerson, a veteran with more than 11 years of experience investigating possession and importation of illegal narcotic substances, would know this meaning of the word "stuff" when used by a suspected drug courier.

Moreover, the overheard conversation of a suspect is important evidence. The prisons of this nation are densely populated with persons convicted by evidence consisting of conversations either advertently or inadvertently overheard by law enforcement officers. See, *e.g.*, *United States v. Eisler*, 567 F.2d 814 (8th Cir.1978), hallway conversation overheard by trespassing drug enforcement agent; *Autry v. Estelle*, 706 F.2d 1394 (5th Cir.1983), telephone con-

---

**1.** This court is aware that the court of appeals for this circuit, in *United States v. Piet,* 498 F.2d 178, 182 (1974), rejected the observation in *Higgins* because the person searched in *Piet,* though claiming innocence, either believed that seizure

of the stolen goods was inevitable or that cooperation with the FBI would serve his interests. 498 F.2d at 182. From a careful evaluation of the evidence in this proceeding, this court finds that nothing of the kind is present in this case.

versation between defendant and his mother overheard by police officer; *United States v. Agapito*, 620 F.2d 324 (2d Cir. 1980), defendants' conversation overheard by DEA agents who pressed their ears to door of adjacent room; *United States v. Mankani*, 738 F.2d 538, 35 CrL 2270 (2d Cir.1984), conversation overheard by government agent who pressed ear to hole between his room and that of suspected drug traffickers. Yet, as important as was Fulkerson's overhearing of defendant's alleged incriminating statement, he never told either Burzinski or Kinsella about it; nor did he confront defendant with the fact he had been overheard using words that suggested he had drugs in his possession.

Burzinski contradicts Fulkerson. She testified to having heard defendant telephone his friend, just as had Fulkerson; but she denied having heard defendant say he had any "stuff"; all that she heard defendant say was "something to the effect that the subject had returned home and he was hungry." Fulkerson attempts to explain his discrepancy by saying that Burzinski walked away from the booth just as defendant was uttering the incriminating words. Burzinski does not give this explanation; she does not claim she walked away from the telephone booth at that crucially important moment. As a consequence, this court does not believe Fulkerson's testimony in this regard.

Burzinski contradicts Fulkerson on yet another point. She swore that throughout the time Fulkerson was questioning defendant, she was a short distance from them and could see both men. She insisted that they were where she could see them most of the time they were talking with each other; she was only a few feet away and close enough for her to hear the conversation about defendant's identification. However, Burzinski testified that she did not hear anything said, either by defendant or Fulkerson, about search of the bag; the only time she saw Fulkerson open the bag was after he had arrested the defendant. Fulkerson stated under oath that he went through the bag with defendant's consent, and it was thereafter that he arrested defendant.

Inconsistencies or discrepancies in the testimony of a witness, especially when given under oath, impose on the court the burden of considering whether they pertain to matters of importance or unimportant details. *In Re Carr*, 436 F.Supp. 493, 495 (N.D.Ohio 1977). The inconsistencies and discrepancies which have attracted this court's attention do not concern unimportant details. They touch on the substance of what occurred in the airport stop that took only a few moments. Moreover, since this is a case in which the court must decide which witness to believe, it has carefully observed their manner and demeanor as they gave testimony. The demeanor of witnesses is a highly useful, even if not an infallible method of ascertaining the truth and accuracy of their narratives. *Oscar Gruss & Son v. Lumbermens Mut. Cas. Co.*, 41 F.R.D. 279, 282 (S.D.N.Y.1966); see *Arnstein v. Porter*, 154 F.2d 464, 469–70 (2d Cir.1946).

From this truth-finding process, and because of their importance, the court has considered the inconsistencies in Fulkerson's testimony, the discrepancies between his testimony and that of Burzinski, and concludes that either he is not telling the truth, or he is mistaken. As the court said in *United States v. Berry*, 670 F.2d 583, 596 (5th Cir.1982), "in such a situation [i.e., during an airport stop of a person by a law enforcement agent] it would be easy to misinterpret acquiescence to an officer's demands as consent...." And it is worth adding, as the court did in *Berry*, that "however great is the government interest, and however great is the difficulty in ending drug smuggling, we cannot use those reasons for suspending the Fourth Amendment." 670 F.2d at 602.

■■ Therefore, since Fulkerson's testimony is the only evidence to support the government's contention that defendant, during the airport stop in question, consented to the search of his carry-on bag, it is this court's judgment that the government has not carried its burden of proving

the claimed consent. See *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); cf. *Schneckloth v. Busamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); see, e.g., *United States v. Robinson*, 690 F.2d 869 (11th Cir.1982); *United States v. Cantero*, 551 F.Supp. 397 (N.D.Ill.1982); *United States v. Guiliani*, 581 F.Supp. 212 (N.D.Ill.1984). It follows that since he had neither warrant, probable cause, nor consent, Fulkerson's search of defendant's bag was unconstitutional, and the evidence he found was illegally obtained. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973).

## IV

This means that Fulkerson should not have used the illegally seized Deering preparation kit as probable cause to arrest defendant; the arrest was the fruit of a prior illegal search. It has been said by a highly respected authority on the subject that "[i]f the police conduct an illegal search and as a consequence discover evidence which provides cause that a particular person has committed a crime, an arrest of that person based upon this information is unquestionably tainted...." 3 LaFave, Search and Seizure 11.4(e) (1978); see *Silverthorne Lumber Co., Inc. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); cf. *United States v. Politano*, 491 F.Supp. 456, 459 (W.D.N.Y.1980). In this case, the only reason Fulkerson had for arresting defendant was his unconstitutional finding of the kit. Use in this prosecution of that evidence, and what Fulkerson found in defendant's boot after the unlawful arrest, will violate defendant's Fourth Amendment rights. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1913). For these reasons, in the trial of this case, the government will not be permitted to use as evidence either the kit or what was seized from defendant after his arrest. An appropriate order will be entered.

So ordered.